## FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DAVID ENG,
          *Plaintiff-Appellee,*

v.

STEVE COOLEY, District Attorney;
STEVEN SOWDERS, Head Deputy
District Attorney; CURT LIVESAY,
former Chief Deputy District
Attorney; ANTHONY PATCHETT,
former Special Assistant to the
District Attorney; and CURTIS A.
HAZELL, Assistant District
Attorney; in their individual
capacities,
          *Defendants-Appellants.*

No. 07-56055

D.C. No.
CV-05-02686-ODW

OPINION

Appeal from the United States District Court
for the Central District of California
Otis D. Wright, II, District Judge, Presiding

Argued and Submitted
November 20, 2008—Pasadena, California

Filed January 14, 2009

Before: Richard D. Cudahy,* Harry Pregerson, and
Michael Daly Hawkins, Circuit Judges.

Opinion by Judge Hawkins

*The Honorable Richard D. Cudahy, Senior United States Circuit Judge
for the Seventh Circuit, sitting by designation.

507

**COUNSEL**

Jin Suk Choi, Franscell, Strickland, Roberts & Lawrence, P.C., Glendale, California, for the defendants-appellants.

D. Jay Ritt, Bensinger, Ritt, Tai & Thvedt, LLP, Pasadena, California, for the plaintiff-appellee.

**OPINION**

HAWKINS, Circuit Judge:

We must determine whether Steve Cooley, Steven Sowders, Curt Livesay, Anthony Patchett, and Curtis Hazell (collectively, the "Defendants") are entitled in their individual capacities to qualified immunity in this § 1983 First Amendment retaliation case.[1] Resolving this question involves, in part, David Eng's claim that he was retaliated against by the

---

[1]Eng's complaint also identifies as defendants the County of Los Angeles and the named defendants in their official capacities. Qualified immunity is not available, however, to municipalities or individuals in their official capacities. *See, e.g.*, *Hallstrom v. City of Garden City*, 991 F.2d 1473, 1482 (9th Cir. 1993) ("A municipality (and its employees sued in their official capacities) may not assert a qualified immunity defense to liability under Section 1983." (citing *Owen v. City of Independence*, 445 U.S. 622, 638 (1980); *Kentucky v. Graham*, 473 U.S. 159, 165-68 (1985))). We therefore consider only the individual defendants in their individual capacities in this interlocutory appeal.

Defendants for an interview given by his lawyer on his behalf to the press. Concluding that we lack jurisdiction to address whether Eng has third party standing to vindicate the constitutional rights of his lawyer, but that he may nevertheless claim a personal First Amendment interest in his lawyer's advocacy on his behalf, we affirm the district court's partial denial of qualified immunity.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

"Assuming that [Eng]'s version of the material facts is correct, as we must in the context of an interlocutory appeal of a qualified immunity decision," *CarePartners, LLC v. Lashway*, 545 F.3d 867, 878 (9th Cir. 2008), the record establishes the following.

### A.   Factual Background

Eng, a Los Angeles County Deputy District Attorney, was assigned to the Belmont Task Force ("Task Force") to investigate allegations of fraud and environmental crimes related to the planning and construction of the Los Angeles Unified School District's Belmont Learning Complex ("Belmont"). The Task Force was established by newly-elected District Attorney Steve Cooley, who had campaigned on a promise to reform the Belmont project. The Task Force was headed by Special Assistant Anthony Patchett, who emphasized from the beginning that the Task Force would deliver "slam dunk" indictments against prominent individuals involved with the Belmont project.

Following an extensive seven-month investigation, the Task Force concluded that the building site was and had always been environmentally safe and that no indictments should issue. Hours before the Task Force presented its findings and recommendations to Cooley and his executive staff, Eng briefed Patchett about the report. Patchett threatened Eng with "severe [personal] consequences" if the Task Force did

not say what Patchett believed Cooley "wanted to hear." Eng nevertheless presented his report recommending that no criminal charges be brought. Following Eng's discussion of the Task Force's findings, Patchett made his own presentation opposing Eng's report and distributed proposed indictments against several prominent individuals. Cooley's executive staff considered both recommendations and declined to adopt Patchett's.

In the same meeting, the Task Force also discussed a *Los Angeles Times* article reporting that the Los Angeles Unified School District's (the "School District") lease-purchase agreements used to finance the Belmont project were being canceled and that the School District would have to refinance the project at a substantially higher interest rate. According to Eng, the agreements were cancelled because Patchett had improperly leaked to the IRS that the School District had committed fraud in purchasing the Belmont property. Eng argued that the lease-purchase agreements had been legal and that Patchett's contrary report to the IRS was "wrong and should be rectified." Cooley, who had become angry with Eng, told him to "shut up."

Over the next several months, Cooley and members of his staff met frequently to discuss "a method of forcing David Eng out of the District Attorney's Office." First, a few months after the presentation, John Zajeck (who replaced Patchett as head of the Task Force) informed Eng that he was under investigation for sexual harassment of a Task Force law clerk with whom Eng had previously engaged in a consensual "private relationship." The relationship was not unusual and was not in violation of any office policy.

Patchett and Zajeck had approached the law clerk earlier to inquire about the relationship. She told the pair that Eng had not sexually harassed her, nor had she told anyone he had. After learning that Zajeck had initiated a sexual harassment investigation against Eng, moreover, she expressly advised

the department that Eng had not sexually harassed her. The investigation nevertheless proceeded without the law clerk's knowledge or participation. Eng was told to work from home until further notice and not permitted to return to work until the following month.

Next, in what Eng asserts was a "clear demotion," Cooley reassigned him to the Pomona Juvenile Division, even though Eng was a senior attorney in the office, and the Juvenile Division is "considered to be the first stop for beginning attorneys." (Eng had served in the Juvenile Division in the mid-1980s.) Eng was also interviewed by three District Attorney investigators regarding the alleged sexual harassment charge. During the interview, the investigators falsely claimed that the law clerk had not disavowed the alleged harassment. No harassment charges were ever brought against Eng.

About five months later, Eng was suspended with pay and instructed not to return to work without further notice, at which time he retained attorney Mark Geragos. Eng was subsequently served with a Notice of Intent to Suspend, which stated that misdemeanor charges had been filed against him for using an office computer to access private information. Head Deputy Steven Sowders subsequently informed Eng that he was being suspended without pay. Eng and Geragos argued that, because the allegations were baseless, his suspension should be with pay. That request was denied. Sowders terminated Eng's pay and benefits and also refused to allow him to "cash out" his vacation time, as was ordinarily allowed.

When the misdemeanor charges against Eng went to trial some two months later, they were dismissed when the only potential witness against Eng invoked his Fifth Amendment right to remain silent, evidently having misused office computers himself. Sowders still refused to allow Eng to return to work. Eng and Geragos appealed to the County Civil Service Commission, which ordered that Eng be allowed to return to work and that his lost pay and benefits be restored. Sowders

refused to follow the order and extended Eng's suspension without pay for an additional thirty days.

Around the same time, the *Los Angeles Times* published a prominent article on Eng's case, titled "D.A. Accused of Payback Prosecution." The article, which included an interview with Geragos, detailed Eng's allegations that he had been prosecuted because he refused to file criminal charges against individuals involved in the Belmont School project, and because he complained that it was improper for members of the Task Force to contact the IRS.

Shortly after the article went to press, Sowders informed Eng and Geragos that Eng would "never be allowed to come back" to the District Attorney's Office and that "they would come up with additional things to charge Eng with so that he would remain on suspension or be terminated." Ironically, the day after the article was published, the District Attorney's office released the final Belmont Report, which mirrored the conclusions originally presented by Eng.

Two weeks after the *Los Angeles Times* article appeared, Sowders met with Eng and served him with a second Notice of Intent to Suspend, realleging the same facts as in the original notice and recounting additional allegations "stemm[ing] from acts which purportedly occurred years prior." During the meeting, Sowders asked Eng why he had allowed Geragos to give an interview to the *Los Angeles Times*. In a subsequent meeting among Eng, Geragos, Sowders, and Chief Deputy District Attorney Curt Livesay, Sowders offered to "resolve matters" if Eng agreed to "tell the *Los Angeles Times* that Geragos's comments were unauthorized and inaccurate, and if he would publicly apologize to Cooley."

Without agreeing to the retraction, Eng returned to work one week later at the Padrinos Juvenile Court. The following week, however, the District Attorney's office issued a second Notice of Suspension without Pay, evidently again ignoring

the Civil Service Commission's order and the dismissal of the criminal charges against Eng. In a second hearing before the Civil Service Commission, the Commission resolved all outstanding allegations in Eng's favor, including the sexual harassment charges. Eng later returned to work once again but discovered that he was not receiving full benefits. He has since been passed over for promotion.

## B.  Procedural Background

Eng filed suit under 42 U.S.C. § 1983 asserting, in addition to a range of state law claims, that the Defendants had retaliated against him for exercising his First Amendment right to comment on the Belmont School Project and the leaks to the IRS, and to speak through his attorney to the press, in violation of the First and Fourteenth Amendments.

Following discovery, the Defendants moved for summary judgment, asserting in part qualified immunity from suit. The district court granted summary judgment with respect to Eng's recommendation that no criminal charges be filed against individuals associated with the Belmont project. According to the court, "Eng was merely fulfilling his job duties when he gave his Task Force recommendation," and therefore those statements were "not protected under the First Amendment."

The district court denied the remainder of the Defendants' motion for summary judgment. The court first addressed whether Eng had asserted a constitutional right. With respect to his comments about the leaks to the IRS, it concluded that "there is a genuine factual dispute between the parties as to whether this statement by Eng was made as part of his Task Force duties or as a private citizen speaking on a matter of public concern." With respect to Eng's attorney's interview with the *Los Angeles Times*, the district court concluded that "[t]he attorney made the statements on Eng's behalf, in his role as counsel. Consequently, the two have a sufficiently

close relationship that Eng will be able effectively to assert his attorney's rights."

Having "established that Eng has legitimate First Amendment claims with regard to his protected speech," the district court concluded that "First Amendment protection is a clearly established constitutional right" and the Defendants therefore were not immune from liability. The Defendants appeal.

## II.   JURISDICTION AND STANDARD OF REVIEW

We have interlocutory appellate jurisdiction pursuant to 28 U.S.C. § 1291 to review the partial denial of qualified immunity in this 42 U.S.C. § 1983 action. *See Mitchell v. Forsyth*, 472 U.S. 511, 524 (1985).

The district court granted qualified immunity with respect to certain of Eng's statements, which it determined were constitutionally unprotected. Generally, "a challenge to the *grant* of qualified immunity [is] not independently interlocutorily appealable." *Krug v. Lutz*, 329 F.3d 692, 694 (9th Cir. 2003) (emphasis added). Although we may take pendant jurisdiction to review a grant of qualified immunity on interlocutory appeal if it is "inextricably entwined" with a denial of qualified immunity, *Watkins v. City of Oakland*, 145 F.3d 1087, 1091 (9th Cir. 1998), this is not such a case, nor does Eng argue it is. We therefore lack jurisdiction to review the district court's partial *grant* of qualified immunity and will consider only those statements with respect to which the district court *denied* qualified immunity.

Our interlocutory jurisdiction to review a denial of qualified immunity is limited exclusively to questions of law, which we review de novo. *Lee v. Gregory*, 363 F.3d 931, 932 (9th Cir. 2004). A district court's determination that the parties' evidence presents genuine issues of material fact is categorically unreviewable on interlocutory appeal. *Id.* (citing *Mendocino Envtl. Ctr. v. Mendocino County*, 192 F.3d 1283,

1291 (9th Cir. 1999)). "Where disputed facts exist, we assume that the version of the material facts asserted by [the] Plaintiff[ ], as the non-moving party, is correct." *KRL v. Estate of Moore*, 512 F.3d 1184, 1189 (9th Cir. 2008). We must therefore limit our review to whether the Defendants would be entitled to qualified immunity as a matter of law assuming all factual disputes were resolved in Eng's favor.

## III.   DISCUSSION

The qualified immunity inquiry involves two sequential questions: (1) "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the [official's] conduct violated a constitutional right?" and (2) "if a violation could be made out on a favorable view of the parties' submissions, . . . [was] the right . . . clearly established . . . in light of the specific context of the case[?]" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). We address each question in turn.

## A.   Whether Eng Alleged a Violation of a Constitutional Right

### 1.   Whether Eng May Assert a Claim for his Attorney's Speech

**[1]** Before addressing whether Eng has demonstrated that the Defendants violated his constitutional rights, we must first decide as a threshold matter whether he has a first person interest, or third-party standing to vindicate Geragos's interest, in Geragos's interview with the *Los Angeles Times*.

Both the parties and the district court frame this question as one of third-party standing. The Defendants argue that Eng cannot pursue a "vicarious" First Amendment retaliation claim for statements made by Geragos because Eng has not demonstrated that Geragos was hindered from protecting his own interests. Eng counters that because Geragos was not himself injured, his ability to protect his own First Amend-

ment interests was indeed hindered because he has no standing to bring his own lawsuit. The district court agreed, concluding that "Eng should be granted third-party standing to assert a claim based, in part, upon the violation of his attorney's right to free speech."

**[2]** We lack jurisdiction, however, to consider whether Eng may assert third-party standing to vindicate Geragos's First Amendment interests. Our interlocutory review of the denial of qualified immunity in this case is limited to the narrow question whether the allegations indicate the Defendants violated Eng's clearly established constitutional rights. The question of standing, however, is relevant only to whether Eng may ultimately *recover* for the alleged violation and is collateral to the inquiry whether the violation has been sufficiently plead. *See, e.g.*, *Davis v. Federal Election Comm'n*, 128 S. Ct. 2759, 2769 (2008) (standing is relevant only to "whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed," not to the merits of the underlying claim). Qualified immunity, the Supreme Court has explained, "focuses on *the objective legal reasonableness of an official's acts*," *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982) (emphasis added), and not on whether the plaintiff may or may not recover for the alleged illegalities.

**[3]** We therefore agree with the Seventh Circuit that "the appropriate focus in a qualified immunity analysis is the legality of the conduct of the public official, not . . . his liability to the ultimate plaintiff." *Triad Associates, Inc. v. Robinson*, 10 F.3d 492, 499 (7th Cir. 1993). According to the policies underlying qualified immunity, " '[w]here an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesitate,' " regardless whether " 'the person who suffers injury caused by such conduct may have a cause of action.' " *Id.* at 500 (quoting *Harlow*, 457 U.S. at 821). Whether Eng has standing to assert Geragos's own First Amendment interests

is therefore not before us.**²** In any event, we do not believe Eng need raise a third-party standing claim because we hold that Geragos and Eng each have a first person constitutional interest in Geragos's speech.

[4] It is well settled that when a lawyer speaks on behalf of a client, the lawyer's right to speak "is almost always grounded in the rights of the client, rather than any independent rights of the attorney." *Mezibov v. Allen*, 411 F.3d 712, 718, 720 (6th Cir. 2005) (citing *Zal v. Steppe*, 968 F.2d 924, 931 (9th Cir. 1992) (Trott, J., concurring)). In *Legal Services Corp. v. Velazquez*, 531 U.S. 533 (2001), for example, the Supreme Court considered whether Congress could impose negative conditions on grants to legal services organizations, such as "prevent[ing] an attorney from arguing to a court that [federal welfare laws are] violative of the United States Constitution." *Id.* at 536. By its terms, the law at issue in that case prevented *attorneys* who accepted funding from the Federal Legal Services Corporation ("LSC") from speaking certain words on behalf of their clients. The Supreme Court framed the question presented, however, as whether the law "violates the First Amendment rights of LSC grantees *and their clients*." *Id.* at 536 (emphasis added).

[5] In invalidating the restrictions, *Velazquez* reasoned that "an LSC-funded attorney speaks on the behalf of the client" and is the client's "speaker." *Id.* at 542. Just as the govern-

---

**²**District courts may, of course, address standing when passing on Rule 12(b)(6) and 56 motions predicated on qualified immunity, but any ruling on such issues will generally be independent of the qualified immunity inquiry itself and cannot be raised on interlocutory appeal. Except in the rare circumstance that the standing decision is "inextricably intertwined" with the qualified immunity decision, *Swint v. Chambers County Com'n*, 514 U.S. 35, 50-51 (1995), we may address such matters only on appeals from final judgments. *See Will v. United States*, 389 U.S. 90, 96 (1967) ("All our jurisprudence is strongly colored by the notion that appellate review should be postponed, except in certain narrowly defined circumstances, until after final judgment has been rendered by the trial court.").

ment's lawyer must "deliver the government's message," the private citizen's lawyer must deliver the private citizen's message. *Id.* *Velasquez* therefore suggests that government action seeking to limit an attorney's advocacy "on behalf of" a client implicates the client's, as well as the attorney's, First Amendment interests—the attorney is, after all, the client's speaker hired to deliver the client's message.**[3]**

**[6]** This conclusion is a natural corollary of the long-recognized First Amendment right to hire and consult an attorney. *See, e.g.*, *Mothershed v. Justices of the Supreme Court*, 410 F.3d 602, 611 (9th Cir. 2005) ("[W]e recognize . . . the 'right to hire and consult an attorney is protected by the First Amendment's guarantee of freedom of speech, association and petition.' " (quoting *Denius v. Dunlap*, 209 F.3d 944, 953 (7th Cir. 2000))); *DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir. 1990) ("The right to retain and consult an attorney . . . implicates . . . clearly established First Amendment rights of association and free speech."). The Tenth Circuit has concluded, for example, "that an individual's First Amendment rights of association and free speech are violated when a police officer retaliates against her for retaining an attorney." *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999). But the First Amendment's prohibition against state retaliation for *hiring* a lawyer would ring hollow if the state could simply retaliate for the lawyer's *advocacy* on behalf of the client instead. A client's free speech interest in an attorney's speech on the client's behalf therefore necessarily follows from the client's First Amendment right to retain counsel.

---

**[3]**Although both *Velazquez* and *Mezibov* addressed attorneys' representation of their clients in the courtroom, we see no reason to limit recognition of a client's constitutional interest in an attorney's representation to in-court speech only. There can be little doubt that zealous representation extends far beyond the confines of brief-writing, examination of witnesses, and oral argument. This case itself demonstrates that fact.

**[7]** The further corollary of that interest, as *Velazquez* recognized, is that "[c]ounsel [must] be free of state control" and unfettered in the exercise of "independent judgment on behalf of the client." 531 U.S. at 542 (citing *Polk County v. Dodson*, 454 U.S. 312, 321-22 (1981)). In this case, if the state were able to retaliate freely against Eng for statements made by his lawyer on his behalf, lawyers' representation of public-employee-plaintiffs would be chilled, and the state's actions would be "insulat[ed]" from full and open "judicial challenge," thereby "distort[ing] the legal system." *Id.* at 544, 547. There can be little doubt, then, that " '[s]tate action designed to retaliate against and chill [an attorney's advocacy for his or her client] strikes at the heart of the First Amendment.' " *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989) (citation omitted).

**[8]** Here, the district court concluded that when Geragos spoke to the press about Eng's First Amendment retaliation case, Geragos "made the statements on Eng's behalf, in his role as counsel." The Defendants do not dispute this characterization. Because Geragos spoke on Eng's behalf in his capacity as Eng's lawyer, his words were Eng's words as far as the First Amendment is concerned. Eng himself therefore had a personal First Amendment interest in Geragos's speech.

### 2.   *The First Amendment Retaliation Test*

Having determined that Eng had a personal constitutional interest in his own speech about the leak to the IRS and in Geragos's interview with the *Los Angeles Times*, we turn now to the question whether Eng has alleged a violation of that interest.

**[9]** It is well settled that the state may not abuse its position as employer to stifle "the First Amendment rights [its employees] would otherwise enjoy as citizens to comment on matters of public interest." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968). Acknowledging the limits on the state's ability to

silence its employees, the Supreme Court has explained that "[t]he problem in any case is to arrive at a balance between the interests of the [public employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.*

**[10]** In the forty years since *Pickering*, First Amendment retaliation law has evolved dramatically, if sometimes inconsistently. Unraveling *Pickering*'s tangled history reveals a sequential five-step series of questions: (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech. Analysis of these questions, further complicated by restraints on our interlocutory appellate jurisdiction, involves a complex array of factual and legal inquiries requiring detailed explanation.

*First*, the plaintiff bears the burden of showing that the speech addressed an issue of public concern. *See Connick v. Myers*, 461 U.S. 138 (1983)*; Bauer v. Sampson*, 261 F.3d 775, 784 (9th Cir. 2001). "Speech involves a matter of public concern when it can fairly be considered to relate to 'any matter of political, social, or other concern to the community.' " *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 422 (9th Cir. 1995) (quoting *Connick*, 461 U.S. at 146). But "speech that deals with 'individual personnel disputes and grievances' and that would be of 'no relevance to the public's evaluation of the performance of governmental agencies' is generally not of 'public concern.' " *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983)). " 'Whether an employee's speech addresses a matter of public concern must be

determined by the content, form, and context of a given statement, as revealed by the whole record.' " *Johnson*, 48 F.3d at 422 (quoting *Connick*, 461 U.S. at 147-48).

The public concern inquiry is purely a question of law, which we review de novo. *Berry v. Dept. of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006) (citing *Hyland v. Wonder*, 972 F.2d 1129, 1134 (9th Cir. 1992)). If the speech in question does not address a matter of public concern, then the speech is unprotected, and qualified immunity should be granted.

***Second***, the plaintiff bears the burden of showing the speech was spoken in the capacity of a private citizen and not a public employee. *See Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006); *Posey v. Lake Pend Oreille School Dist. No. 84*, 546 F.3d 1121, 1126-27 (9th Cir. 2008). "Statements are made in the speaker's capacity as citizen if the speaker 'had no official duty' to make the questioned statements, or if the speech was not the product of 'performing the tasks the employee was paid to perform.' " *Posey*, 546 F.3d at 1127 n.2 (some internal quotations and alterations omitted) (quoting, respectively, *Marable v. Nitchman*, 511 F.3d 924, 932-33 (9th Cir. 2007), and *Freitag v. Ayers*, 468 F.3d 528, 544 (9th Cir. 2006)).

While "the question of the scope and content of a plaintiff's job responsibilities is a question of fact," the "ultimate constitutional significance of the facts as found" is a question of law. *Id.* at 1129-30. In evaluating whether a plaintiff spoke as a private citizen, we must therefore assume the truth of the facts as alleged by the plaintiff with respect to employment responsibilities. If the allegations demonstrate an official duty to utter the speech at issue, then the speech is unprotected, and qualified immunity should be granted.

***Third***, the plaintiff bears the burden of showing the state "took adverse employment action . . . [and that the] speech was a 'substantial or motivating' factor in the adverse action."

*Freitag*, 468 F.3d at 543 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)); *see also Marable*, 511 F.3d at 930, n.10 ("It is [the plaintiff]'s burden to show that his constitutionally protected speech was a motivating factor in [the state]'s adverse employment action.").

This third step is purely a question of fact. Once again, in evaluating whether the government's adverse employment action was motivated by the employee's speech, we must assume the truth of the plaintiff's allegations. If the plaintiff does not sufficiently allege that the state retaliated for the employee's exercise of First Amendment rights, there can be no recovery, and qualified immunity should be granted.

***Fourth***, if the plaintiff has passed the first three steps, the burden shifts to the government to show that "under the balancing test established by [*Pickering*], the [state]'s legitimate administrative interests outweigh the employee's First Amendment rights." *Thomas v. City of Beaverton*, 379 F.3d 802, 808 (9th Cir. 2004); *see also CarePartners*, 545 F.3d at 880. This inquiry, known as the *Pickering* balancing test, asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." *Garcetti*, 547 U.S. at 418. Its qualified restriction of ordinarily protected speech recognizes that "[a] government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Id*.

Although the *Pickering* balancing inquiry is ultimately a legal question, like the private citizen inquiry, its resolution often entails underlying factual disputes. *See, e.g.*, *Rivero v. City & County of San Francisco*, 316 F.3d 857, 865-66 (9th Cir. 2002) (determining "the outcome of the *Pickering* balancing test" requires resolving underlying "question[s] of fact"); *Hyland*, 972 F.2d at 1139 ("Application of this balancing test entails" resolution of underlying "factual inquir[ies]").

Thus we must once again assume any underlying disputes will be resolved in favor of the plaintiff to determine, as a matter of law, whether the state has "adequate justification" to restrict the employee's speech. If the allegations, viewed in light most favorable to the plaintiff, indicate adequate justification, qualified immunity should be granted.

*Fifth* and finally, if the government fails the *Pickering* balancing test, it alternatively bears the burden of demonstrating that it "would have reached the same [adverse employment] decision even in the absence of the [employee's] protected conduct." *Thomas*, 379 F.3d at 808 (quoting *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 976-77 (9th Cir. 2002)). In other words, it may avoid liability by showing that the employee's protected speech was not a but-for cause of the adverse employment action. *See Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). This question relates to, but is distinct from, the plaintiff's burden to show the protected conduct was a substantial or motivating factor. It asks whether the "adverse employment action was based on protected *and* unprotected activities," and if the state "would have taken the adverse action if the proper reason alone had existed." *Knickerbocker v. City of Stockton*, 81 F.3d 907, 911 (9th Cir. 1996) (emphasis added).

The *Mt. Healthy* but-for causation inquiry is purely a question of fact. *Wagle v. Murray*, 560 F.2d 401, 403 (9th Cir. 1977) (per curium) ("*Mt. Healthy* indicates the 'trier-of-fact' should determine whether the firing would have occurred without the protected conduct."); *see also Karam v. City of Burbank*, 352 F.3d 1188 (9th Cir. 2003). In evaluating whether the employee's speech was a but-for cause of the adverse employment action, we must therefore once again assume the truth of the plaintiff's allegations. Immunity should be granted on this ground only if the state successfully alleges, without dispute by the plaintiff, that it would have made the same employment decisions even absent the questioned speech.

*3.   Whether Eng Passes the First Amendment Retaliation Test*

Applying this five-step First Amendment retaliation test, we conclude the allegations here demonstrate that Eng's First Amendment rights were violated with respect to both Eng's comments about the leak to the IRS and Geragos's statements on Eng's behalf to the press.

a.   Whether Eng's Speech Addressed Matters of Public Concern

The Defendants did not argue below and have not argued on appeal that Eng's statements did not address a matter of public concern. Accordingly, any such argument is waived. *See, e.g.*, *Butler v. Curry*, 528 F.3d 624, 642 (9th Cir. 2008) (defendant "waived this argument by failing to raise it either in the district court or in his brief on appeal" (citing *Nw. Acceptance Corp. v. Lynnwood Equip., Inc.*, 841 F.2d 918, 923 (9th Cir.1988))).

**[11]** In any event, there is little doubt that Eng's speech did address matters of public concern. " '[C]ommunication[s] on matters relating to the functioning of government' . . . are matters of inherent public concern." *Johnson v. Multnomah County, Or.*, 48 F.3d 420, 425 (9th Cir.1995) (quoting *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir.1983) (quoting *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (plurality opinion))). The leaking of information (whether true or false) about the School District's lease-purchase agreements to the IRS was therefore a matter of public concern insofar as it led to the need for additional, more expensive financing for the public school complex.

**[12]** Speech that is " 'relevan[t] to the public's evaluation of the performance of governmental agencies' " also addresses matters of public concern. *Freitag*, 468 F.3d at 545 (quoting *Coszalter v. City of Salem*, 320 F.3d 968, 973-74

(9th Cir. 2003)). Here, the leaking of such statements, as well as Geragos's statements to the *Los Angeles Times* regarding the retaliatory prosecution against Eng, were certainly " 'relevan[t] to the public's evaluation of the performance of' " the District Attorney's office. *Freitag*, 468 F.3d at 545 (quoting *Coszalter*, 320 F.3d at 973-74). We therefore conclude Eng's speech addressed matters of public concern.

### b.   Whether Eng Spoke as a Private Citizen

The Defendants expend great effort arguing that Eng's speech with respect to the IRS leak was "inextricably related to his work," and therefore that his speech was not protected because it was uttered in his capacity as public employee. But the district court determined that there is a genuine factual dispute between the parties regarding whether Eng's speech about the IRS leaks was made as part of his Task Force duties or as a private citizen. The district court's determination that the parties' evidence presents genuine issues of material fact is not reviewable on interlocutory appeal. *Lee*, 363 F.3d at 932. Once again, "[w]here disputed facts exist, . . . we can determine whether the denial of qualified immunity was appropriate [only] by assuming that the version of the material facts asserted by the non-moving party is correct." *Jeffers*, 267 F.3d at 903.

**[13]** Here, there can be no doubt that Eng's version of the facts plausibly indicates he had no official duty to complain about any leak to the IRS or to authorize Geragos to speak to the press about the retaliation being taken against him.

### c.   Whether the Adverse Employment Action Was Motivated By Eng's Speech

As a threshold matter, we must consider the full range of adverse employment actions alleged in the complaint. Although the Defendants correctly note that the district court determined Eng was barred by the statute of limitations from

recovering for any adverse employment actions taken before January 1, 2003,[4] whether any specific acts complained of are time-barred is (like the third-party standing question) collateral to the limited, interlocutory qualified immunity inquiry. Whether a plaintiff brings an action in time to challenge certain conduct is irrelevant, that is, to the logically independent question whether the state violated the plaintiff's clearly established rights. The applicability of the statute of limitations is therefore not before us, and we will consider the full range of adverse employment actions stated in Eng's complaint.

[14] The Defendants do not dispute that the initial investigations and first suspension were motivated by Eng's protected speech. They argue only that Eng's transfer to the juvenile division "was not motived by any subject speech" and that "any argument by [Eng] that the 2003 suspension was motivated by his attorney's statements [to the press] was unsupported by the evidence." These assertions ignore, however, that we must assume resolution of the disputed facts in Eng's favor. Eng's account of the meeting with Livesay and Sowders, for example, plainly undermines the Defendants' contrary assertion that the systematic investigations, prosecution, suspensions, and demotion of Eng were not motivated by his speech. Eng's further accounts of Cooley's meetings with his staff to discuss "a method of forcing David Eng out of the District Attorney's Office," and Sowders's threats to both Eng and Geragos following publication of the *Los Angeles Times* article, all also indicate that Eng's speech was a "substantial or motivating" factor in the adverse employment action.

---

[4]We are skeptical that the district court was correct to apply the "discrete acts" rather than "repeated conduct" analysis to, for example, the ongoing investigations and prosecutions at issue in this case. *See Amtrak v. Morgan*, 536 U.S. 101, 110-21 (2002) (distinguishing for statute of limitations purposes between "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire" and practices that "cannot be said to occur on any particular day," and instead "occur[ ] over a series of days or perhaps years").

### d. *Pickering* Balancing

Eng having passed the first three steps of the First Amendment retaliation test, the burdens of evidence and persuasion now shift to the Defendants to show that the balance of interests justified their adverse employment decision. But the Defendants did not argue before the district court, and do not argue before us now, that their interest in regulating Eng's speech was sufficient to outweigh Eng's free speech interest. They have therefore waived this argument. *See, e.g.*, *Butler*, 528 F.3d at 642.

**[15]** In any event, Eng's allegations show that the District Attorney lacked adequate justification for treating Eng differently from other members of the public. The Defendants have neither alleged nor offered any evidence to support a conclusion that investigating, suspending, prosecuting, or transferring Eng for his speech was "necessary for [the District Attorney's office] to operate efficiently and effectively." *Garcetti*, 547 U.S. at 419 (citing *Connick*, 461 U.S. at 147). Rather, viewing the allegations in the light most favorable to Eng, the full range of adverse employment action appears to have been a politically-motivated effort to silence Eng, who stood to embarrass Cooley by undermining a central plank in his campaign platform. On the record before us at this stage in the case, the Defendants have not met their burden under the *Pickering* balancing test.

### e. *Mt. Healthy* But-For Causation

Rather than addressing *Pickering*, the Defendants argue that they "would have reached the same [adverse employment] decision even in the absence of [Eng]'s protected conduct." *Thomas*, 379 F.3d at 808 (quoting *Ulrich*, 308 F.3d at 976-77). They assert, for example, that Eng's suspensions would have been approved regardless of his protected speech because they were in fact "due to the information gathered from three separate internal investigations involving separate

and independent allegations of misconduct." This argument ignores Eng's allegations that the investigations and apparently baseless charges were *themselves* motivated by his exercise of his First Amendment rights.

The Defendants further assert that Eng's performance on a promotability review undermines a but-for connection between his speech acts and his having been passed over for promotion. But Eng alleges he received a low score on the promotion review in part because his record contained accusations of sexual harassment and misuse of office computers—accusations *themselves* motivated by his exercise of his First Amendment rights.

**[16]** Taking Eng's version of the facts as true, the Defendants have therefore not met their burden to show that Eng's protected speech was not a but-for cause of the adverse employment actions taken against him. In sum, Eng has properly alleged a violation of his constitutional rights.

## B. Whether Eng's Rights Were Clearly Established

### 1. The Clearly-Established Standard

**[17]** Passing the First Amendment retaliation test is only a plaintiff's first hurdle before defeating a motion for summary judgment on qualified immunity. In addition to showing the violation of a constitutional right, a plaintiff must also demonstrate that the constitutional rights at issue were clearly established at the time of the violation. The "clearly established" requirement "operates 'to ensure that before they are subjected to suit, [government officials] are on notice their conduct is unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Saucier*, 533 U.S. at 206). For a constitutional right to be clearly established, "its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' " at the time of his conduct. *Id.* (citations omitted) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1987)). If a plaintiff's constitutional rights were not clearly established at the time of the violation, then qualified immunity should be granted.

### 2.   *Whether Eng's Rights Were Clearly Established*

#### a.   Eng's Speech about the Leak to the IRS

The Defendants did not argue before the district court, and do not argue before this court now, that Eng's rights were not clearly established with respect to any speech *not* spoken pursuant to his official employment duties. Relying on *Garcetti* (decided in 2006), the Defendants assert only that "the law was not clearly established [in 2001] as to the nature of First Amendment protection for public employee speech *expressed pursuant to official job duties*." This observation is beside the point.

*Garcetti* makes clear that if Eng's comments about the leaks to the IRS *were* spoken pursuant to his official job duties, then he cannot recover regardless of the state of the law in 2001, since there is no private First Amendment interest in "speech that owes its existence to a public employee's professional responsibilities." 547 U.S. at 421. And if the statements were *not* spoken pursuant to Eng's job duties, the Defendants do not dispute that Eng's free speech interest was clearly established.

**[18]** Nor could they. *Garcetti* concluded only that "work product" that "owes its existence to [an employee]'s professional responsibilities" is *not* protected by the First Amendment. *Id*. at 422. (Regulation of such speech "simply reflects the exercise of employer control over what the employer itself has commissioned or created." *Id*. at 422.) Prior to *Garcetti*, the Defendants therefore may have been uncertain whether the Task Force report itself was protected, but only insofar as they might reasonably have believed that it *was* protected when in fact it was *not*. There could be no confusion, how-

ever, that when Eng "comment[ed] upon matters of public concern" "as a citizen" and *not* pursuant to his job responsibilities, his speech *was* protected by the First Amendment—that rule had long been the law of the land.[5] *See, e.g.*, *Mt. Healthy*, 429 U.S. at 248 (quoting *Pickering*, 391 U.S. at 568). Thus, assuming Eng's version of the facts to be true, he had a clearly established right to comment on the leak to the IRS.[6]

### b.   Eng's Attorney's Speech to the Press

**[19]** Geragos's and Eng's respective First Amendment interests in Geragos's speech to the press were also clearly established at the time of the alleged retaliation. The clarity of Geragos's interest in his own speech (regardless of Eng's standing to vindicate that interest) is beyond dispute.

With respect to Eng's personal interest, by 2003, the right to retain and consult an attorney "implicate[d] . . . clearly established First Amendment rights of association and free speech." *DeLoach*, 922 F.2d at 620. It was also clearly established that "an individual's First Amendment rights of association and free speech are violated when a police officer retaliates against her for retaining an attorney." *Malik*, 191 F.3d at 1315. An individual's personal First Amendment

---

[5]Whether it was "clear" that Eng spoke pursuant to his job duties is a question of fact and not law; the only question here is whether Eng's free speech right was "clearly established" as a matter of law, assuming his version of the facts to be true.

[6]We have previously characterized the *Pickering* balancing test as "a context-intensive, case-by-case balancing analysis," the outcome of which is rarely clear; thus "the law regarding [First Amendment retaliation] claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Dible v. City of Chandler*, 515 F.3d 918, 930 (9th Cir. 2008) (quoting *Moran v. Washington*, 147 F.3d 839, 847 (9th Cir.1998)). Because the Defendants waived the *Pickering* balancing argument, we need not address whether the Defendants' lack of justification to treat Eng differently was clearly established.

interest in his or her lawyer's speech on his or her behalf is a natural corollary of the First Amendment right to retain counsel. Any other conclusion would eviscerate that right.

*Velazquez* had also been decided two years prior to Geragos's interview with the *Los Angeles Times*. That decision recognized that a federal law seeking to prevent lawyers from making certain arguments on behalf of their clients implicated the client's First Amendment rights. As the Sixth Circuit later concluded, "*Velazquez* [did not] recognize a First Amendment right personal to the attorney independent of his client," and lawyers' free speech interests when advocating on behalf of clients "[are] almost always grounded in the rights of the client, rather than any independent rights of the attorney." *Mezibov*, 411 F.3d at 720.

**[20]** Although we have not previously addressed a case precisely like this one, " 'officials can still be on notice that their conduct violates established law even in novel factual circumstances.' " *Porter v. Bowen*, 496 F.3d 1009, 1026 (9th Cir. 2007) (quoting *Hope*, 536 U.S. at 741); *see also Hope*, 536 U.S. at 741 ("Although earlier cases involving 'fundamentally similar' facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding."). Because this case involved "mere application of settled law to a new factual permutation," *Porter*, 496 F.3d at 1026, we conclude that Eng's personal First Amendment interest in Geragos's speech was clearly established by 2003. *Denius*, *DeLoach*, and *Velazquez* were sufficient to put the Defendants on notice of the common sense conclusion that the government may not retaliate against a public employee for speech spoken by the employee's lawyer on the employee's behalf.

## IV. CONCLUSION

The district court's partial denial of qualified immunity is affirmed in full.

**AFFIRMED**.