M. SMITH, Circuit Judge,
specially concurring:
I write separately to share my view that BSD’s actions were also justified to avoid violating the Establishment Clause. Kennedy’s claim therefore fails on the additional ground that the District can satisfy the fourth Eng factor. See Eng v. Cooley, 552 F.3d 1062, 1071-72 (9th Cir. 2009) (asking whether the state has an adequate justification for restricting the employee’s speech). I also write to share a few thoughts about the role of the Establishment Clause in protecting the rights of all Americans to worship (or not worship) as they see fit.
I. Governing Law
The Establishment Clause provides that “Congress shall make no law respecting an establishment of religion.”’ U.S. Const, amend.. I. The Clause applies against the states, and therefore their public school systems, pursuant to the Fourteenth Amendment. See Wallace v. Jaffree, 472 U.S. 38, 49-50, 105 S.Ct. 2479, 86 L.Ed.2d 29 (1985). The Clause “mandates governmental neutrality between religion and religion, and between religion and nonreligion.” McCreary Cty., Ky. v. Am. Civil Liberties Union of Ky., 545 U.S. 844, 860, 125 S.Ct. 2722 (2005) (quoting Epperson v. Ark., 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)) (internal quotation marks omitted). “The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and secondary schools.” Edwards v. Aguillard, 482 U.S. 578, 583-84, 107 S.Ct. 2573, 96 L.Ed.2d 510 (1987). In that setting, “[t]he State exerts .great authority and coercive power through mandatory attendance requirements, and because of the students’ emulation of teachers as role models and the children’s süsceptibility to peer pressure.” Id. at 584, 107 S.Ct. 2573. Accordingly, the Clause “proscribes public schools from conveying or attempting to convey a message that religion or a particular religious belief is favored or pre *832 ferred.” Lee v. Weisman, 505 U.S. 577, 604-05, 112 S.Ct. 2649, 120 L.Ed.2d 467 (1992) (Blackmun, J., concurring) (internal quotation marks and emphasis omitted).
Under the fourth Eng factor, the District can escape potential liability if it can show that it had an adequate justification for treating Kennedy differently from other members of the general public. Eng, 552 F.3d at 1071-72. “[A] state interest in avoiding an Establishment Clause violation may be characterized as compelling, and therefore may justify content-based discrimination.” Good News Club v. Milford Cent. Sch., 533 U.S. 98, 112, 121 S.Ct. 2093, 150 L.Ed.2d 151 (2001) (internal quotation marks omitted); see also Peloza v. Capistrano Unified Sch. Dist., 37 F.3d 517, 522 (9th Cir. 1994) (“The school district’s interest in avoiding an Establishment Clause violation trumps [a teacher’s] right to free speech.”).[1]
Santa Fe Independent School District v. Doe, 530 U.S. 290, 120 S.Ct. 2266, 147 L.Ed.2d 295 (2000), describes the framework for assessing whether BSD would be liable for an Establishment Clause violation if Kennedy were to resume kneeling and praying on the fifty-yard line immediately after games in the presence óf students and spectators. See id. at 315, 120 S.Ct. 2266 (asking whether the “continuation of’ prayer at school event would violate the Establishment Clause).
In Santa Fe, the plaintiffs challenged a school district policy that permitted, but did not require, a student to deliver a prayer over the public address system before each varsity football game. Id. at 294, 120 S.Ct. 2266. The “Prayer at Football Games” policy “authorized two student elections, the first to determine whether Invocations’ should be delivered, and the second to select the spokesperson to deliver them.” Id. at 297, 120 S.Ct. 2266 (internal quotation marks omitted). After the students had voted in favor of prayer and selected a speaker, the school district implemented two changes. It omitted the word “prayer” from the title and amended the policy to refer to “‘messages’ and ‘statements’ as well as ‘invocations.’ ” Id. at 298, 120 S.Ct. 2266 (internal quotation marks omitted).
To assess whether the amended policy violated the Establishment Clause, the Court asked whether an objective student observer who was familiar with the history and context of the school’s conduct would perceive that “prayer is, in actuality, encouraged by the school.” Id. at 308, 120 S.Ct. 2266. Put differently, the relevant question was “whether an objective observer, acquainted with the text, legislative history, and implementation of the [policy], would perceive it as a state endorsement of prayer in public schools.” Id. (emphasis added) (internal quotation marks omitted). Applying that rule, the Court held that “an objective Santa Fe High School student *833 w[ould] unquestionably perceive the inevitable pregame prayer as stamped with her school’s seal of approval.” Id.
The Court first considered the setting. The prayer would be “delivered to a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property.” Id. at 307, 120 S.Ct. 2266. The message would also be “broadcast over the school’s public address system,” which was “subject to the control of school officials.” Id. The pregame ceremony would be “clothed in the traditional indicia of school sporting events, which generally include not just the team, but also cheerleaders and band members dressed in uniforms sporting the school name and mascot.” Id. at 308, 120 S.Ct. 2266. Further, the school’s name would be emblazoned on the field and the crowd would be “waving signs displaying the school name.” Id. The upshot, said the Court, was that an objective audience member would perceive the pregame prayer as a public expression “delivered with the approval of the school administration.” Id.
The text and purpose of the policy reinforced that conclusion. The express purpose of the pregame message was to “solemnize the event.” Id. at 306, 120 S.Ct. 2266. Yet tellingly, the only message type the text endorsed was an “invocation,” and “in the past at Santa Fe High School, an ‘invocation’ ha[d] always entailed a focused religious message.” Id. at 306-07, 120 S.Ct. 2266 (internal quotation marks omitted). The Court also noted that the school regulated the content of the message. Among other things, the message had to “establish the appropriate environment for competition.” Id. at 306, 120 S.Ct. 2266 (internal quotation marks omitted). The school also required that the pregame message “promote good sportsmanship.” Id.
The history and context of the policy bolstered the conclusion that an objective observer would perceive the school to be encouraging prayer. The school had a “long-established tradition of sanctioning student-led prayer at varsity football games,” id. at 315, 120 S.Ct. 2266, and the policy itself had evolved from the “office of ‘Student Chaplain’ to the candidly titled ‘Prayer at Football Games’ regulation,” id. at 309, 120 S.Ct. 2266. The Court noted that the prayers were possible only because the school board had chosen to give the students the opportunity to deliver pregame messages. Id. With that context, the Court said it was “reasonable to infer that the specific purpose of the policy was to preserve a popular state-sponsored religious practice.” Id. (internal quotation marks omitted).
Lastly, the Court was “persuaded that the delivery of a pregame prayer has the improper effect of coercing those present to participate in an act of religious worship.” Id. at 312, 120 S.Ct. 2266. According to the Court, some nonadherents were likely required to attend the games, “such as cheerleaders, members of the band, and, of course, the team members themselves.” Id. at 311, 120 S.Ct. 2266. Even those who were not so required would “feel immense social pressure,” the Court said, “to be involved in the extracurricular event that is American high school football.” Id. (internal quotation marks omitted). So, by allowing the prayer to be delivered, the district was impermissibly forcing students to choose “between attending these games and avoiding [a potentially] personally offensive religious ritual ].” Id. at 312, 120 S.Ct. 2266.
Mindful of the totality of these circumstances, the Court concluded that “the realities of the situation plainly reveal that [the district’s] policy involves both perceived and actual endorsement of religion.” *834 Id. at 305, 120 S.Ct. 2266. It therefore violated the Establishment Clause. Id. at 316, 120 S.Ct. 2266.
II. Application
Here, an objective BHS student familiar with the history and context of Kennedy’s conduct would perceive his practice of kneeling and praying on the fifty-yard line immediately after games in view of students and spectators as District endorsement of religion or encouragement of prayer. The District therefore justifiably restricted Kennedy’s speech to avoid violating the Establishment Clause.
A. The setting, context, and history support the perception that Kennedy’s conduct would be viewed as state endorsement of religion.
The setting supports this conclusion. If Kennedy’s practice were to resume, an objective student would observe a public-school 'employee in BHS-logoed attire demonstratively praying in front of “a large audience assembled as part of a regularly scheduled, school-sponsored function conducted on school property.” Id. at 307, 120 S.Ct. 2266. Based on previous experience, Kennedy’s players would likely join him, meaning he would likely be surrounded by a majority of the team. The speech would also occur at the most prominent location on the field during a time when Kennedy is responsible for supervising players. Lastly, the scene would likely exhibit “the traditional indicia of school sporting events,” including “cheerleaders and band members dressed in uniforms,” an audience “waving signs displaying the school name,” and the school’s name or initials “written in large print’ across the field and on banners and .flags.” Id. at 308, 120 S.Ct. 2266.
The context would bolster the. perception that the District was endorsing religion. An objective observer would know that Kennedy had access to the field only by virtue of his position as a coach, that a Satanist group had been denied such access, and that Kennedy insists on demonstratively praying only while in view of students and spectators. True, in contrast to Santa Fe, the District would not be authorizing or regulating the content of Kennedy’s prayers. See 530 U.S. at 306-07, 120 S.Ct. 2266. Still, an objective observer would know that it is Kennedy’s professional duty to communicate demonstratively to students and spectators after games, and that use of the field, like use of the public address system, is “subject to the control of school officials.” Id. at 307, 120 S.Ct. 2266.
The relevant history would add to the perception that' the District encourages prayer. An objective observer would know that during the previous eight years, Kennedy led and participated in locker-room prayers, regularly prayed on the fifty-yard line, and eventually led a larger spiritual exercise at midfield after each game. BSD states that it was not aware of this conduct until 2015, but if Kennedy were to resume his practice of praying at midfield, an objective student could reasonably infer that the District was ratifying the religious exercises that Kennedy had previously conducted. This inference, would follow because the District would be acquiescing to Kennedy’s conduct knowing, full well that the players prayed only when Kennedy elected to do so, and that the previous practice started as an individual prayer but evolved into an orchestrated session of faith.[2]
*835 Lastly, by permitting Kennedy’s conduct, the District would be condoning the same coercion idéntified in Santa Fe. As was true in that case, various students would be required to attend the games, “such as cheerleaders, members of the band, and, of course, the team members themselves.” Id. at 311, 120 S.Ct. 2266. They would see an important District representative display “the ' distinctively Christian prayer-form”[3] in the most prominent location on the field, despite the community's religious diversity. This act would “send[ ] the ancillary message to members of the audience who are nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community,” Id. at 309-10, 120 S.Ct. 2266 (internal quotation marks omitted). Kennedy might not “intentionally involve students in his on-duty religious activities,” (emphasis added), but I have no reason to believe that the pressure emanating from his position of authority would dissipate. Accordingly, many students would feel pressure to join Kennedy’s religious activity to avoid marking themselves as outsiders or alienating themselves from the team. The record suggests that this is precisely what occurred when Kennedy first started praying on the field in 2008. See Kennedy Decl. at 3 (“Over time, the. number of players who gathered near me after the. game grew to include the majority of the team.”). Yet the Constitution forbids Kennedy from forcing students whose beliefs are not the same as his to compromise their personal beliefs or identify themselves as religious dissenters.
In sum, if Kennedy were to resume kneeling and praying on the fifty-yard line immediately after games while in view of students and spectators, an objective student observer would see an influential supervisor do something no ordinary citizen could do — perform a Christian religious act on secured school property while surrounded by players — simply because he is a coach. Irrespective of thé District’s views on that matter, a reasonable observer would conclude in light of the history and contéxt surrounding Kennedy’s conduct that the District, “in actuality,” favors religion, and prefers Christianity in particular.[4] Santa Fe, 530 U.S. at 308, 120 S.Ct. 2266.
*836 B. Kennedy’s counterarguments are not persuasive.
Kennedy contends that an objective observer would “conclude (at most) that he is engaged in a personal moment of silence” because students would not be directly coerced to pray, the District would not be regulating the content of his religious expression, and the prayer would not be the product of a school policy, in contrast to the prayer at issue in Santa Fe. These observations may be correct, but they have little significance when considered within the totality of the circumstances. Indeed, they are rebutted by the evidence of indirect coercion, and the fact that an objective observer familiar with the context would know it is Kennedy’s professional duty to communicate demonstratively to students and spectators after games.
Next, Kennedy insists that kneeling and praying on the fifty-yard line would not be viewed as state endorsement of religion because a coach’s expressive conduct around a playing field is quintessential personal speech. Kennedy notes that some athletes point to the heavens after a touchdown, or kneel when a player is being treated for an injury, yet fans do not generally view either of those actions as having been made on behalf of the team. Even if that is true, it says little about the speech at issue here, and it ignores entirely the relevant history and context surrounding Kennedy’s speech. See Santa Fe, 530 U.S. at 315, 120 S.Ct. 2266 (holding courts may not “turn a blind eye to the context in which [the conduct] arose”).
Lastly, Kennedy contends that the remedy for any inference of endorsement “is to educate the audience rather than squelch the speaker.” Hills v. Scottsdale Unified Sch. Dist. No. 48, 329 F.3d 1044, 1055 (9th Cir. 2003) (quoting Hedges v. Wauconda Cmty. Unit Sch. Dist. No. 118, 9 F.3d 1295, 1299-1300 (7th Cir. 1993)). However, we have held that a disclaimer is not sufficient to alleviate Establishment Clause concerns in the graduation speech context, Lassonde v. Pleasanton Unified Sch. Dist., 320 F.3d 979, 984 (9th Cir. 2003), and it is similarly unlikely that a disclaimer would cure the perception of endorsement at issue here. Once again, an objective student observer would still see a respected District employee do something no ordinary citizen could do — perform a distinctively Christian religious act on a secured portion of school property while supervising students — simply because he is a BHS football coach. Moreover, because Kennedy’s speech would occur in the course of his ordinary responsibilities and he would be speaking in his capacity as a public employee, his conduct would be attributed to the District, thus diluting the effect of any potential disclaimer. See Borden, 523 F.3d at 177 n.20 (“As an employee of the School District as both a coach and tenured teacher, Borden’s actions can be imputed to the School District. For this reason, Borden’s claim that the School District could remove any Establishment Clause violation by writing a disclaimer saying that Borden’s speech does not represent the ideals of the School District is simply wrong.”); Doe v. Duncanville Ind. Sch. Dist., 70 F.3d 402, 406 (5th Cir. 1995) (stating that during school-sponsored sporting events coaches “are present as representatives of the school and their ac *837 tions are representative of [school district] policies”).[5]
In sura, the District can satisfy the fourth Eng factor. It justifiably restricted Kennedy’s speech to avoid violating the Establishment Clause. An objective BHS student familiar with the relevant history and context would perceive Kennedy’s conduct to reflect school endorsement of religion, encouragement of prayer, and a preference for one particular faith.[6]
III. Averting state establishment of religion ultimately safeguards religious liberty.
Some readers may find this conclusion disconcerting. The record reflects, after all, that Coach Kennedy cared deeply about his students, and that his conduct was well-intentioned and flowed from his sincerely-held religious beliefs. Given those factors, it is worth pausing to remember that the Establishment Clause is designed to advance and protect religious liberty, not to injure those who have religious faith. Indeed, history has taught us “that one of the greatest dangers to the freedom of the individual to worship in his own way lay[s] in the Government’s placing its official stamp of approval upon one particular kind of prayer or one particular form of religious services.” Engel v. Vitale, 370 U.S. 421, 429, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962).
It is a lamentable fact of human history that whenever a religious majority controls the government, it frequently uses the civil power to persecute religious minorities and non-believers.[7] The Founders who met in Philadelphia to negotiate the terms of the U.S. Constitution, and the men who later met in ratifying conventions in the several states, were well aware that many hundreds of thousands of people had lost their lives, been tortured, or had otherwise been deprived of their civil rights by governments in the control of some religious faith, during the then recent European wars of religion. These cataclysmic events led writers such as Thomas Hobbes (1588-1679) and John Locke (1632-1704), each of whom was familiar to the Founders, to argue that state coercion is an inappropriate and ineffective tool for enforcing religious conformity, since religious belief must be sincerely held to be truly efficacious.
*838 In some ways, the United States is a nation whose very existence is due to religious conflict because most of the colonies were initially settled by persons who came here to escape religious persecution in Europe. When such colonists came, they generally settled amongst those who held similar religious beliefs, and the dominant religious group controlled the civil government, just as had been the case in Europe. Thus, Anglicans initially dominated in Virginia, Puritans in Massachusetts, Quakers in Pennsylvania, Baptists in Rhode Island, and Roman Catholics in Maryland. But when, for example, the Puritan leaders of the Massachusetts Bay Colony were challenged by religious dissenters, such as Roger Williams and Anne Hutchinson, the dissidents were banished from, and persecuted by, the Colony over disagreements concerning theology, as were Catholics and non-Puritans generally. Violence was frequently employed in many of the colonies to suppress religibus dissenters.
Seeking to make America a more true refuge from • religious persecution, some early leaders began to advocate for the disentanglement of religion and government. For example, in responding to a bill introduced by Patrick Henry calling for state support for “Teachers of the Christian Religion,” future president James Madison penned an essay arguing that Virginia should not financially support Christian instruction. See James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), in 5 The Founders’ Constitution 82 (P. Kurland & R. Lerner eds. 1986). Madison asked rhetorically: “Who does not see that the same authority which can establish Christianity, in exclusion of all other Religions, may establish with the same ease any particular sect of Christians, in exclusion of all other Sects?” Id. He also observed that Henry’s bill was “a departure from that generous policy, which, offering an Asylum to the persecuted and oppressed of every Nation and Religion, promised a lustre to our country.” Id. at 83.
After Henry’s bill was defeated, the Virginia legislature eventually took up Thomas Jefferson’s plan for the separation of church and state. In 1786, the Virginia Bill for Establishing Religious Freedom was adopted. Among other things, that Bill provided:
We the General Assembly of Virginia do enact, that no man shall be compelled to frequent or support any relig[i]ous Worship place' or Ministry whatsoever, nor shall be enforced, restrained, molested, or burthened in his body or goods, nor shall otherwise suffer on account of his religious opinions or belief, but that all men shall be free to profess, and by argument to maintain their opinions in matters of religion, and that the same shall in no wise diminish, enlarge, or-affect their civil capacities. '
Id. at 77. Jefferson wrote that the law was “meant to comprehend, within the mantle of its protection, the Jew and the Gentile, the Christian and Mahometan, the Hindoo, and Infidel of every denomination,” Thomas Jefferson, Autobiography (1821), in 5 The Founders’ Constitution, at 85.
Madison endeavored to make Jefferson’s vision a part of the Constitution. For example, Article VI of the Constitution requires that all federal officials “shall be bound by Oath or Affirmation, to support this Constitution; but no religious Test shall ever be required as a Qualification to any Office or public Trust under the United States.” U.S. Const. art. VI, cl. 3. Later, what became the First Amendment to the Constitution included the words: “Congress shall make no law respecting an establishment of religion, or prohibiting *839 the free exercise thereof....” Id. amend. I. The purpose of these clauses is to protect our freedom of worship unhindered by the government.
This very brief glimpse of one aspect of our history is intended, to show that, having learned from the harmful effects of past religious conflicts, our nation’s Founders included in our foundational law safeguards against religious oppression by a government (or arms of that government) under the control of a religious majority that would punish or severely limit our right to worship (or not worship) as we please. This is a priceless bulwark of our personal freedom, and I hope that interested readers will come to appreciate the Establishment Clause as a good friend and protector, and not as an enemy, of one of their most precious rights and liberties.
IV. Conclusion
Striking an appropriate balance between ensuring the right to free speech and avoiding the endorsement of a state religion has never been easy. Thankfully, we no longer resolve these conflicts with violence, but instead use courts of law, where parties make arguments in free and open hearings to address their differences. To that end, I commend the lawyers in these proceedings for the exceptional job they have done.
At the end of the day, I believe that a resumption of Kennedy’s conduct would violate the Establishment Clause. I would therefore deny the preliminary injunction on the additional ground that BSD can satisfy the fourth Eng factor.

. The parties disagree as to whether the District must show an actual Establishment ' Clause violation, see Good News, 533 U.S. at 112-13, 121 S.Ct. 2093, or merely a legitimate interest in avoiding an Establishment Clause violation, see Lamb's Chapel v. Cir. Moriches Union Free Sch. Dist., 508 U.S, 384, 394, 113 S.Ct. 2141, 124 L.Ed.2d 352 (1993) (noting the Court's suggestion in a prior case that “the interest of the State in avoiding an Establishment Clause violation may be a compelling one justifying an abridgement of free speech otherwise protected by the First Amendment.” (internal quotation marks and alteration omitted)); Berry v. Dep't of Soc. Servs., 447 F.3d 642, 651 (9th Cir. 2006) (holding that the government’s “need to avoid possible violations of the Establishment Clause” justified a restriction on employee speech). I do not reach this issue because a resumption of Kennedy’s conduct would clearly result in an actual Establishment Clause violation.

. Again, perhaps bolstering this inference, an objective observer would likely see Kennedy surrounded by his players. An objective observer familiar with the relevant history *835 would also know that the football team had engaged in pre- and post-game prayers "as a matter of school tradition,” and that both activities apparently "predated” Kennedy’s involvement with the football program. With that context, an objective observer might reasonably perceive that the District had changed its mind regarding the propriety of Kennedy’s conduct. This is particularly so because BSD had ^previously stated in a letter to the Bremerton community that it could not permit Kennedy’s conduct lest it be considered to be endorsing religion.

. Amici note that Kennedy employed "the distinctively Christian prayer form of kneeling with hands clasped and head bowed — a pose with deep historical significance and symbolic meaning within Christianity.” Br. of Americans United for Separation of Church and State et al. as Amici Curiae Supporting Appel-lee at 12. By contrast, Jews "do not typically kneel,” and instead "stand for prayer and often sway.” Id. at 13. For Muslims, "the typical prayer posture is prostration, though prayer also involves standing and bowing.” Id. Prayer in the Bahá’í faith "involves kneeling, bowing, and prostration.” Id. Hindus and Buddhists “pray in the seated, cross-legged lotus position.” Id. Finally, it is worth noting that the Bremerton community includes individuals who identify as atheist or as agnostic. Id. at 14.

. Borden v. Sch. Dist. of Tp. of E. Brunswick, 523 F.3d 153 (3rd Cir. 2008), supports this conclusion. There, the Third Circuit held that a football coach impermissibly endorsed religion by bowing his head and taking a knee while his players engaged in prayer, Id. at 174, Like Kennedy, the coach had a history of leading team prayers, yet stated that he want *836 ed to bow and kneel only to show respect to his team. Id. at 177. The court concluded that the history gave rise "to a reasonable inference that [the coach’s] requested conduct is meant to preserve a popular state-sponsored religious practice of praying with his team.” Id. (internal quotation marks omitted). In light of Kennedy's history, an objective observer could draw the same inference here, notwithstanding Kennedy’s statement that he seeks only to pray silently and alone.

. I nonetheless emphasize that schools should not simply "throw up their hands because of the possible misconceptions about endorsement of religion.” Hills, 329 F.3d at 1055. Instead, they should endeavor "to teach [students] about the first amendment, about the difference between private and public action, [and] about why we tolerate divergent views,” as BSD’s letter to the Bremerton community admirably sought to do here. Id. (first alteration in original) (quoting Hedges, 9 F.3d at 1299). "Free speech, free exercise, and the ban on establishment are quite compatible when the government remains neutral and educates the public about the reasons.” Id. (quoting Hedges, 9 F.3d at 1300). However, in this instance, BSD would not be remaining neutral in the eyes of an objective observer if it were to permit Kennedy to resume his on-field prayers,

. The District also contends that Kennedy’s conduct fails the so-called "coercion” test and the three-prong framework from Lemon v. Kurtzman, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). I do not address those arguments in light of the analysis outlined above.

. Interested readers might find Will (and later Will and Ariel) Durant’s epic series on the history of civilization, with separate volumes entitled The Age of Faith, The Renaissance, The Reformation, The Age of Reason Begins, The Age of Louis XIV, The Age of Voltaire, and Rousseau and Revolution, amongst others, an excellent source to learn more about this subject, See Will Durant & Ariel Durant, the story of civilization (MJF Books 1993).