**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| CHARLES MOSER,<br>*Plaintiff-Appellant*,<br><br>and<br><br>JOHN SABATINI,<br>*Plaintiff*,<br><br>v.<br><br>LAS VEGAS METROPOLITAN POLICE DEPARTMENT; DEVIN BALLARD; PATRICK NEVILLE,<br>*Defendants-Appellees*. | No. 19-16511<br><br>D.C. Nos.<br>2:17-cv-01012-JAD-NJK<br>2:17-cv-01704-JAD-NJK<br><br><br>OPINION |

Appeal from the United States District Court
for the District of Nevada
Jennifer A. Dorsey, District Judge, Presiding

Argued and Submitted September 3, 2020
Pasadena, California

Filed January 12, 2021

Before:  Eugene E. Siler,[*] Marsha S. Berzon, and
Kenneth K. Lee, Circuit Judges.

Opinion by Judge Lee;
Dissent by Judge Berzon

## SUMMARY[**]

### Civil Rights

The panel reversed the district court's summary judgment in favor of the Las Vegas Metropolitan Police Department and remanded in an action brought by a former SWAT sniper who alleged that the Department unconstitutionally retaliated against him for his protected speech when it dismissed him from the SWAT team after he commented on Facebook that it was a "shame" that a suspect who had shot a police officer did not have any "holes" in him.

The district court construed plaintiff's statement as advocating unlawful violence and ruled that the government's interest in employee discipline outweighed plaintiff's First Amendment right under the balancing test for speech by government employees, set forth in *Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968).

---

[*] The Honorable Eugene E. Siler, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel first determined that plaintiff's speech addressed an issue of public concern under the *Pickering* framework, that plaintiff spoke as a private citizen, not a public employee, and that he was demoted because of his speech. The panel held that the district court erred in granting summary judgment for the government because there was a factual dispute about the objective meaning of plaintiff's comment: was it a hyperbolic political statement lamenting police officers being struck down in the line of duty, or, as the Department interpreted, a call for unlawful violence against suspects? Another factual dispute existed over whether plaintiff's comment would have likely caused disruption in the police department. These factual disputes had to be resolved before the court could weigh the competing considerations of plaintiff's First Amendment rights against the government interest in workforce discipline under the *Pickering* balancing test.

Dissenting, Judge Berzon stated that plaintiff waived any argument about the meaning of his Facebook comment and because the Department's interpretation of plaintiff's statement was by far more reasonable than plaintiff's proffered alternative, Judge Berzon would affirm the district court's judgment.

## COUNSEL

Adam Levine (argued) and Daniel Marks, Law Office of Daniel Marks, Las Vegas, Nevada, for Plaintiff-Appellant.

Jackie V. Nichols (argued) and Nick D. Crosby, Marquis Aurbach Coffing, Las Vegas, Nevada, for Defendants-Appellees.

## OPINION

LEE, Circuit Judge:

Social media has allowed Americans to connect with friends in far-flung places and to share their opinions on topics both mundane and momentous. But social media can also tempt people to impulsively make inflammatory comments that they later regret. And even worse for them, employers often react by firing or punishing them for their ill-advised remarks.

Charles Moser is one of those people. A Las Vegas SWAT sniper, Moser commented on Facebook that it was a "shame" that a suspect who had shot a police officer did not have any "holes" in him. After the police department dismissed him from the SWAT team, Moser sued, alleging violation of his First Amendment right. He contended that his comment suggested only that the police officer should have fired defensive shots. The district court, however, construed Moser's statement as advocating unlawful violence, and ruled that the government's interest in employee discipline outweighs Moser's First Amendment right under the *Pickering* balancing test for speech by government employees.

The district court erred in granting summary judgment for the government because there is a factual dispute about the objective meaning of Moser's comment: was it a hyperbolic political statement lamenting police officers being struck down in the line of duty — or a call for unlawful violence against suspects? Another factual dispute exists over whether Moser's comment would have likely caused disruption in the police department. These factual disputes had to be resolved before the court could weigh the competing considerations under the *Pickering* balancing test. We thus reverse the grant of summary judgment and remand.

## BACKGROUND

In 2000, Charles Moser, a former Navy SEAL, joined the Las Vegas Metropolitan Police Department ("Metro"), and became a member of the SWAT team in 2006. Moser served as the Assistant Team Leader of his SWAT unit and acted as a sniper.

In 2015, someone shot a Metro police officer at the Emerald Suites on Las Vegas Boulevard. Metro police officers later found and arrested that suspect. After seeing news of the assailant's capture, Moser — while off-duty at home — commented on a friend's Facebook post linking an article about the shooting:



Moser's December 17, 2015 comment said, "Thanks to a Former Action Guy (FAG) and his team we caught that asshole. . . It's a shame he didn't have a few holes in him. . ."[1]

---

[1] Moser said that "Former Action Guy (FAG)" is a self-deprecating term coined by a former SWAT colleague who switched to a different unit in Metro. Moser's use of that derogatory term is not at issue in this case.

An anonymous tipster alerted Metro's internal affairs department to this Facebook comment, prompting an internal investigation. During his interview with Metro investigators on February 8, 2016, Moser admitted his comment was "completely inappropriate" but explained that he intended to express his frustration that the suspect had "basically ambushed one of our officers" and that "the officer didn't have a chance to defend himself." He also said that he had removed that comment by the time of this interview.

Captain Devin Ballard and Deputy Chief Patrick Neville transferred Moser out of SWAT and put him back on patrol, finding that Moser's Facebook comment showed he had become "a little callous to killing." Moser's supervisors testified that snipers "are held to a higher standard" because they toil in difficult and stressful situations. Internal affairs also determined that Moser's comment violated the department's social media policy and found that his Facebook page had information identifying him as a Metro sniper. Moser filed a grievance report, requesting that he receive a verbal reprimand rather than a transfer with a pay decrease. The Labor Management Board denied Moser's grievance and upheld the transfer.

Moser sued Metro, Captain Ballard, and Deputy Chief Neville for First Amendment retaliation, seeking damages under 42 U.S.C. § 1983 and injunctive relief. He alleged that his disciplinary transfer was unconstitutional retaliation for his protected speech. Metro and Moser both moved for partial summary judgment. Metro did not dispute that Moser made that comment as a private citizen and that it addressed an issue of public concern, but it argued that Moser's comment eroded public trust and exposed Metro to legal liability.

The district court held that Metro's disciplinary action was justified under the *Pickering* balancing test for speech by government employees. While it acknowledged that Moser's statement addressed a "public concern," the district court said it is "difficult to discern what message Moser was attempting to convey" and ultimately believed that Moser "wanted his fellow officers to shoot (and possibly kill) the suspect, regardless of whether the use of deadly force (or any force) was necessary." The district court thus held that Moser's comment was "neither at the core nor the periphery of the First Amendment." Set against this "moderate [First Amendment] interest" was "Metro's prediction of likely future disruptions caused by Moser's continued SWAT service." Specifically, the court reasoned that, if more members of the public read Moser's post, they might question Moser's fitness as a SWAT member. The court also reasoned that "any future use of deadly force by Moser would have been more extensively scrutinized by the public and would more likely subject Metro to suit." The court determined that Metro's interest in employee discipline outweighed Moser's "moderate" free speech interest. The court granted summary judgment for Metro and denied summary judgment for Moser. Moser timely appealed.

## STANDARD OF REVIEW

We review de novo a district court's grant of summary judgment. *See Devereaux v. Abbey*, 263 F.3d 1070, 1074 (9th Cir. 2001) (en banc). Federal Rule of Civil Procedure 56(c) authorizes summary judgment where the moving party shows no genuine issue of material fact. The Court views the facts and inferences drawn from the facts in the nonmovant's favor. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631–32 (9th Cir. 1987).

## ANALYSIS

## I. Under the *Pickering* test, courts must balance a government employee's free speech rights with government efficiency.

The Supreme Court has established a framework to balance the free speech rights of government employees with the government's interest in avoiding disruption and maintaining workforce discipline. *See Pickering v. Bd. of Ed. of Twp. High Sch. Dist.*, 391 U.S. 563 (1968). Under the *Pickering* framework, the plaintiff first has to establish that "(1) []he spoke on a matter of public concern; (2) []he spoke as a private citizen rather than a public employee; and (3) the relevant speech was a substantial or motivating factor in the adverse employment action." *Barone v. City of Springfield, Or.*, 902 F.3d 1091, 1098 (9th Cir. 2018).

If the plaintiff establishes this prima facie case, the burden then shifts to the government to show "that (4) it had an adequate justification for treating [its employee] differently than other members of the general public; or (5) it would have taken the adverse employment action even absent the protected speech." *Id.* If the government does not meet its burden, then the First Amendment protects the plaintiff's speech as a matter of law.

While the *Pickering* balancing test presents a question of law for the court to decide, it may still implicate factual disputes that preclude the court from resolving the test at the summary judgment stage. *See Eng v. Cooley*, 552 F.3d 1062, 1071–72 (9th Cir. 2009) ("Although the *Pickering* balancing inquiry is ultimately a legal question . . . its resolution often entails underlying factual disputes. Thus we must . . . assume any underlying disputes will be resolved in

favor of the [nonmovant].").  We now apply the *Pickering* framework to the facts here.

## II. The district court erred in granting summary judgment for the government because factual disputes preclude it from assessing the *Pickering* balancing test.

At the district court and on appeal, the parties do not dispute any of the *Pickering* factors except for the fourth one — whether the government had adequate justification to treat Moser differently than members of the public.  Still, we briefly address the other factors to provide context for Moser's claims and for our analysis.

### A. Moser's speech addressed an issue of "public concern."

First, the parties do not dispute that Moser's comment addressed an issue of "public concern" under the *Pickering* framework.  An issue is of "public concern" if it "relat[es] to any matter of political, social or other concern to the community," *Eng*, 552 F.3d at 1070 (quotation marks and citation omitted), or "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public," *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004).  "Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record."  *Connick v. Myers*, 461 U.S. 138, 147–48 (1983); *see also Johnson v. Multnomah Cty., Or.*, 48 F.3d 420, 425 (9th Cir. 1995) ("[T]he employee's motivation and the chosen audience are among the many factors to be considered in light of the public's interest in the subject matter of the speech.").

But not all statements of "public concern" are treated equally under the *Pickering* balancing test (as discussed later).  While courts generally do not consider the content of speech under the First Amendment, courts — in the limited context of speech by government employees — have effectively established a sliding scale for how much weight to give to a statement of "public concern" when balancing the employee's and the government's competing interests.

### B. Moser spoke as a private citizen, not a public employee.

Second, the parties do not dispute that Moser made his Facebook comment as a private citizen.  *See Eng*, 552 F.3d at 1071.  "Statements are made in the speaker's capacity as citizen if the speaker had no official duty to make the questioned statements, or if the speech was not the product of performing the tasks the employee was paid to perform." *Id*. (quotation marks and citations omitted).  Moser was home and off duty using his personal Facebook account.

### C.  Metro transferred Moser because of his speech.

Third, the parties again do not dispute that Metro demoted Moser because of his Facebook comment.  *See id*. Moser's supervisors believed that his Facebook comment revealed "that Moser had grown callous to killing."

### D. Metro cannot prevail under the *Pickering* balancing test because there are material factual disputes precluding summary judgment.

Because Moser established the prima facie case, the burden then shifts to Metro to show that "under the balancing test established by *Pickering*, [Metro's] legitimate administrative interests outweigh the employee's First

Amendment rights." *Id.* (quotation marks, alterations, and citation omitted).**[2]** This balancing test asks whether Metro was justified in treating Moser differently from the public by balancing "the interests of [Moser], as a citizen, in commenting upon matters of public concern and the interests of [Metro], as an employer in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568.

Put another way, the *Pickering* balancing test recognizes that a government employer has "broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations." *Eng*, 552 F.3d at 1071 (quotation marks and citation omitted).

### 1. Moser's First Amendment interest: There is a factual dispute about the meaning of Moser's Facebook comment.

While the parties agree that Moser's Facebook comment touched upon an issue of "public concern," that does not end our inquiry into the content of his speech. Even though the government generally cannot consider the content of the speech under the First Amendment, courts have carved a narrow exception for speech by government employees. In the limited context of the *Pickering* balancing test, courts may consider the content of that speech to determine how much weight to give the government employee's First Amendment interests. *See Connick*, 461 U.S. at 146–47.

---

**[2]** Metro does not try to meet its burden under the fifth *Pickering* factor (*i.e.*, it would have taken the adverse employment action absent the speech) because it concedes that it demoted Moser because of his Facebook comment.

Courts have thus implicitly applied a sliding scale in which the "state's burden in justifying a particular discharge [or adverse employment action] varies depending upon the nature of the employee's expression." *Id.* at 150.

At the apex of the First Amendment rests speech addressing problems at the government agency where the employee works. *See, e.g.*, *McKinley v. City of Eloy*, 705 F.2d 1110, 1114 (9th Cir. 1983) (holding that speech criticizing police officer pay "substantially involved matters of public concern and was thus entitled to the highest level of protection"); *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009) (recognizing plaintiff's strong First Amendment interest in speaking out about illegal conduct by public officials); *Kinney v. Weaver*, 367 F.3d 337, 361–62 (5th Cir. 2004) (holding that law enforcement trainers had a "particularly weighty" and "extremely strong" First Amendment interest in testifying about excessive force in a police shooting case).

On the other hand, at least one court has suggested that racially charged comments that have no connection to the government employee's workplace arguably receive less First Amendment protection under the *Pickering* balancing test for government employees. *See, e.g.*, *Grutzmacher v. Howard Cty.*, 851 F.3d 332 (4th Cir. 2017) (holding that a firefighter's racially charged comment is not "of the same ilk" as speech by government employees about public policy problems in their workplace).

We thus need to analyze Moser's speech in weighing his First Amendment rights against the government's interest in efficiency. *See Connick*, 461 U.S. at 146–48. The parties do not, however, agree on the objective meaning of Moser's statement. Metro believes that Moser's comment advocated unlawful use of deadly force: Moser wished that the officers

who captured the suspect would have shot him in retaliation for his earlier shooting of a police officer.

The district court appeared to accept Metro's interpretation of Moser's comment. The district court admitted that it is "difficult to discern what message Moser was attempting to convey," but ultimately concluded that "Moser's post conveyed that he wanted his fellow officers to shoot (and possibly kill) the suspect, regardless of whether the use of deadly force (or any force) was necessary." Not surprisingly, a comment advocating unlawful violence by law enforcement would not be at the high end of the "public concern" scale. The district court thus held that Moser's comment was not at the "core" of First Amendment protection.

Moser, however, offered a different take on his statement. At his interview with internal affairs investigators, he said that he was implying that the police officer who had been ambushed by the suspect — not the police officer who ultimately arrested the suspect — should have fired defensive shots. His statement then takes on a different meaning: He did not advocate unlawful violence, but rather expressed frustration — in an admittedly hyperbolic and inappropriate manner — at the perils of police officers being struck down in the line of duty. Put another way, Moser's comment touches on an important public policy issue that falls within his personal experience.[3]

---

[3] The FBI reported that in the past decade there have been over 20,000 assaults with firearms against law enforcement officials. *See 2019 Law Enforcement Officers Killed & Assaulted*, Federal Bureau of Investigation, https://ucr.fbi.gov/leoka/2019/topic-pages/tables/table-85.xls (last visited on October 20, 2020).

While Moser's comment remains inflammatory even under his interpretation, the Supreme Court has held that the "inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).   In *Rankin*, an employee at the constable's office who opposed President Reagan's policies said, "[I]f they go for him again, I hope they get him" upon learning of John Hinckley, Jr.'s attempted assassination of the President. *Id.* at 381.   The Supreme Court held that the First Amendment protected the government employee's statement because it related to a public concern (President Reagan's policies), despite the incendiary nature of that comment. *Id.* at 386–87.   Here, too, Moser's statement — when viewed in the light most favorable to him under the summary judgment standard — could be objectively interpreted as a provocative political statement against police officers being shot in the line of duty.[4]

In short, a factual dispute exists over the objective meaning of Moser's statement.   Under Metro's reading, Moser advocated unlawful violence against suspects, which would not be in the "core" First Amendment zone (as the district court found).   But under Moser's interpretation, his statement falls within the "core" First Amendment zone because it highlights the perils faced by police officers and the government's failure to protect them.   The district court,

---

[4] Metro argues that Moser's explanation conflicts with the "plain meaning" of his Facebook post.   But Moser's message is objectively ambiguous, as the district court itself noted that it is "difficult to discern" the meaning of the comment.   The dissent suggests that we are considering Moser's subjective interpretation of his Facebook comment. We are not; rather, we are holding that Moser's comment is objectively ambiguous, and that his interpretation of it may be a plausible and objective reading of it.

however, did not resolve this factual dispute over the objective meaning of Moser's statement and instead adopted Metro's reading of it.  That was error.[5]

### 2. Metro's interest in government efficiency: There is a factual dispute whether the government provided any evidence of predicted disruption to Metro.

On the other side of the *Pickering* scale, the court considers the strength of Metro's interest in efficiency and employee discipline.  Courts do not approach this issue in "abstract terms," but look "to how the speech at issue affects the government's interest in providing services efficiently." *Kinney*, 367 F.3d at 362.  The Supreme Court has recognized several factors in evaluating the impact of an employee's speech on the government agency's operation:

> whether the statement impairs discipline by superiors or harmony among co-workers, has

---

[5] The dissent argues that Moser waived the issue of the meaning of his Facebook comment.  While Moser did state to the district court that the comment's meaning was irrelevant as a legal matter, he repeatedly provided evidence from the record that supported his interpretation of the comment.  *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("[T]he district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and *specifically referred to* and facts therein set forth in the motion papers.") (emphasis added).  Such evidence gave rise to a factual dispute regarding the parties' interpretations of the comment.  The district court clearly considered this dispute, as it analyzed the comment's objective meaning in applying the *Pickering* balancing test.  Thus, the issue of the comment's meaning is not waived.  *See Cmty House, Inc. v. City of Boise*, 490 F.3d 1041, 1054 (9th Cir. 2007) ("[E]ven if a party fails to raise an issue in the district court, we generally will not deem the issue waived if the district court actually considered it.").

a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin*, 483 U.S. at 388 (citing *Pickering*, 391 U.S. at 570–73). The Supreme Court has also acknowledged that police departments have heightened interests in "discipline esprit de corps, and uniformity." *Kelley v. Johnson*, 425 U.S. 238, 246 (1976). And the Ninth Circuit has recognized the special need for police departments to avoid disruption to provide public safety. *See Byrd v. Gain*, 558 F.2d 553, 554 (9th Cir. 1977).

The government can meet its burden by showing a "reasonable prediction[] of disruption." *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979 (9th Cir. 1998) (quotation marks and citation omitted). But the government cannot rely on mere speculation that an employee's speech will cause disruption. *Nichols v. Dancer*, 657 F.3d 929, 933–34 (9th Cir. 2011).[6]

Courts give the government employer's reasonable prediction of disruption greater deference than the justifications used to restrict the public's speech. *Waters v.*

---

[6] The dissent notes that the government can appropriately consider whether Moser's comment reflects on his fitness for his job. But Moser's fitness for his job depends on the objective meaning of his comment. If he encouraged unlawful violence, it certainly reflects poorly on his ability to serve as a SWAT officer. But if his comment was merely a hyperbolic statement on a public matter, then it may not. And as noted, we hold that the objective meaning of Moser's Facebook comment is ambiguous.

*Churchill*, 511 U.S. 661, 673 (1994)*.* But "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of the employees' speech." *Rankin*, 483 U.S. at 384. Thus, "bare assertions of future conflict are insufficient to carry the day at the summary judgment stage." *Nichols*, 657 F.3d at 935 (citing *Lindsey v. City of Orrick, Mo.*, 491 F.3d 892, 900 (8th Cir. 2007), *Kinney*, 367 F.3d at 363, and *Andersen v. McCotter*, 100 F.3d 723, 729 (10th Cir. 1996)); *see also Berger v. Battaglia*, 779 F.2d 992, 1001 (4th Cir. 1985) ("[T]hreatened disruption by others reacting to public employee speech simply may not be allowed to serve as justification for public employer disciplinary action directed at that speech.").

It follows that an employer must provide some evidence for the court to evaluate whether the government's claims of disruption appear reasonable. *See Nichols*, 657 F.3d at 934; *see also Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1119 (7th Cir. 2013) ("[A]n employer's assessment of the possible interference caused by the speech must be reasonable—the predictions must be supported with an evidentiary foundation and be more than mere speculation." (quotation marks and citation omitted)).

Courts have accepted a government employer's predictions of disruption when it provided evidence that the community it serves discovered the speech or would inevitably discover it. *See, e.g.*, *Locurto v. Giuliani*, 447 F.3d 159, 183 (2d Cir. 2006) (government lawfully fired police officers who participated in a parade with racist lampooning amid local media coverage of it); *McMullen v. Carson*, 754 F.2d 936, 936–37 (11th Cir. 1985) (city lawfully dismissed a clerical employee who publicly

identified himself as a sheriff's office employee who also moonlights as a KKK recruiter); *Munroe v. Cent. Bucks Sch. Dist.*, 805 F.3d 454, 473–74 (3d Cir. 2015) (city had grounds to dismiss schoolteacher whose blog criticizing her students caused outrage among parents once it was reported in the press); *Melzer v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 336 F.3d 185, 190–91, 200 (2d Cir. 2003) (city lawfully fired schoolteacher who advocated legalizing pedophilia after being identified in a TV news report about teachers who are members of NAMBLA); *Craig*, 736 F.3d at 1119 (school counselor wrote a hypersexualized advice book for women and dedicated it to his students, leading to complaints from parents).

Courts also are more likely to accept a government employer's prediction of future disruption if some disruption has already occurred. *See, e.g.*, *Munroe,* 805 F.3d at 477–78 (relying on over 100 complaints from parents whose children were criticized in the teacher's blog with demands for their children to be placed in a different classroom); *Lumpkin v. Brown*, 109 F.3d 1498, 1501 (9th Cir. 1997) (citing evidence that plaintiff's statements about homosexuality had attracted media attention and "ignited a public outcry").

In contrast, the government cannot prevail if it does not provide enough evidence to support the prediction of future disruption. *See, e.g.*, *Andersen*, 100 F.3d at 729 (ruling that the government employer failed to "provide evidence sufficient to assess the character and weight of [its] interests"). For example, a court may discount the government employer's fears of disruption if there is little evidence that the offending speech has been or will be discovered. In *Rankin*, the court found the law enforcement agency's interests in maintaining efficiency were not threatened, in part because only two fellow employees heard

the plaintiff make the inappropriate comment about President Reagan's assassination attempt. 483 U.S. at 389.

Even where the employer provides evidence of a negative reaction to speech, courts require evidence that it will disrupt the workplace. In *Lindsey*, a city public works director was fired after speaking at public meetings and accusing the city council of violating the law. 491 F.3d at 901. The defendants provided evidence that the plaintiff's speech had caused arguments and made people dislike him, but the court found this insufficient to grant summary judgment, finding no evidence that the speech impaired his working relationship with his fellow employees. *Id*.

The question thus is not whether Metro has an abstract interest in avoiding disruption and litigation, but whether, on this record, Metro could reasonably think Moser's speech threatened those interests. *See Kinney*, 367 F.3d at 362–63.

The record here does not support the government's contention that Moser's Facebook comment would have caused disruption. Typically, courts credit the government's claim where the challenged speech is widely known or reported by the press. Here, there was no media coverage of Moser's comment. In fact, the record shows no evidence that anyone other than the anonymous tipster even saw Moser's Facebook comment. Nor would most people have even known that Moser served as a SWAT sniper because nothing in his Facebook profile confirmed his employment.**[7]**

---

**[7]** The district court found that the public could have deduced Moser's position as a SWAT sniper because (1) a local news article had previously discussed his role in shooting a suspect, and (2) his Facebook profile picture featured an "angry sniper" cartoon. But the fact that an inquisitive person could have theoretically searched Moser's name on an Internet search engine does not mean that the public would do so. And

And importantly, the chance that the public would have seen the Facebook comment remained low because Moser deleted that December 2015 comment by February 2016.[8]

Moser's Facebook comment is like that of the plaintiff in *Rankin*, who wished that a future assassin would succeed against President Reagan because she opposed his policies. 483 U.S. at 389. Both inflammatory statements touched upon a public issue. In both cases, the public did not see or hear the offending comment, which lessens the potential impact on the agency's reputation or mission.

Metro also has provided no evidence to support its claim that Moser's comment will expose Metro to future legal liability. Metro speculates that if Moser shoots someone in the future, the shooting will lead to a lawsuit, that Moser's deleted Facebook comment would be discovered, that the trial judge would admit that Facebook comment as evidence, and that the jury would rely on the Facebook comment to find Metro liable. But Metro has cited no case in which such a long chain of speculative inferences tipped the *Pickering* balancing test in the government's favor. *Cf. Nichols*, 657 F.3d at 934 (citing *Kinney*, 367 F.3d at 363 for the

Moser's use of a cartoon image of an angry sniper hardly reveals his identity. Many people use avatars unrelated to their profession as their profile pictures, and some may have assumed he was in the military (indeed, Moser was a former Navy SEAL).

[8] This does not mean that the government must wait until the media or a critical mass of people notices the challenged speech. Some statements may be so patently offensive (*e.g.*, racial slurs) that the government can reasonably predict they would cause workforce disruption and erode public trust. But because Moser's statement is ambiguous, it is not clear cut whether it would have caused disruption, and the government had to provide some evidence to support its prediction.

proposition that "engaging in *Pickering* balancing is not like performing rational basis review, where we uphold government action as long as there is some imaginable legitimate basis for it").

In sum, material questions of fact remain as to whether Moser's comment would likely disrupt Metro's workforce or its reputation. *See Robinson*, 566 F.3d at 825 (denying summary judgment where there was a factual dispute about whether there was disruption in the police force). Put differently, Metro has produced no evidence to establish that its interests in workplace efficiency outweigh Moser's First Amendment interests.

Metro's cited cases are not to the contrary. In *Dible v. City of Chandler*, the public had discovered the police officer's sex website, and multiple officers testified that the website had interfered with the department's operations. 515 F.3d 918, 923 (9th Cir. 2008). Metro also relies on *Grutzmacher*, but that case is distinguishable because multiple coworkers told plaintiff's supervisors that they did not want to work with plaintiff after seeing his racially charged posts. 851 F.3d at 346. Those conversations led to concerns about the plaintiff's ability to act as a supervisor and role model. *Id.* Here, Metro has provided no evidence of actual or potential disruption in the workplace or to the department's mission.

\* \* \* \* \*

As noted, the *Pickering* balancing test is a legal question, but its resolution often entails underlying factual disputes that need to be resolved by a fact-finder. *See Eng*, 552 F.3d at 1071. Perhaps the jury may answer a special jury verdict form that addresses these *Pickering* factual disputes, and the court can potentially decide the case as a matter of law based

on the responses.  We, however, leave it to the district court's discretion in fashioning the most efficient way to resolve these factual disputes.

## CONCLUSION

We have entrusted law enforcement with the solemn duty of using lawful force if necessary, and police officers thus must behave beyond reproach.  We are also mindful that our society is in a self-reflective moment about excessive force and abuse of power by those who have taken an oath to protect all citizens equally and uphold the Constitution. But we also live in a time when a careless comment can ruin reputations and crater careers that have been built over a lifetime because of the demand for swift justice, especially on social media.   For private employers, it is their prerogative to take action against an intemperate tweet or a foolish Facebook comment.  But when the government is the employer, it must abide by the First Amendment.  In this case, we hold that the district court did not adequately address the objective meaning of Moser's Facebook comment in its *Pickering* analysis to weigh Moser's First Amendment right against the government's interest in workforce discipline.  And because of the disputed facts here, the district court erred in granting summary judgment for Metro.  The district court's decision granting summary judgment for Metro is **REVERSED** and the case is **REMANDED**.

BERZON, Circuit Judge, dissenting:

I respectfully dissent.

The majority identifies two factual disputes, both related to the meaning of Charles Moser's Facebook comment, which it believes should have prevented the district court from granting summary judgment. Specifically, the majority holds that the meaning of Moser's statement is ambiguous and that, as a result, Metro needed to provide some evidence of disruption to the workplace. But Moser conceded to the district court, more than once, that there was no genuine issue of material fact about the meaning of his comment. Further, the majority does not explain how, regardless of waiver, evidence of Moser's private, subjective meaning alone can make his public statement objectively ambiguous. Nor does it properly address whether Metro's interpretation of Moser's comment, ambiguous or not, was reasonable, the touchstone of the *Pickering* balancing test. Because Moser waived any argument about the meaning of his Facebook comment and because Metro's interpretation of Moser's statement was by far more reasonable than Moser's proffered alternative, I would affirm the district court's judgment.

## I

The majority takes up Moser's argument on appeal that, "[i]n conducting the *Pickering* balancing test," the district court's conclusion that the police department's interests as an employer outweighed Moser's First Amendment interests as a citizen was "based upon an erroneous assumption" about the intended meaning of his Facebook comment and "ignored the evidence in the record." Specifically, the district court wrote as part of the *Pickering* balancing test that "Moser's post conveyed that he wanted his fellow

officers to shoot (and possibly kill) the suspect, regardless of whether the use of deadly force (or any force) was necessary." *Sabatini v. Las Vegas Metro. Police Dep't*, 369 F. Supp. 3d. 1066, 1092 (D. Nev. 2019). Moser does not on appeal contest the reasonableness of this understanding of what he said. Instead, Moser asserts that his Facebook comment, although "inappropriate," was actually *meant* to express "his regret that the ambushed officer did not get off any defensive shots." As evidence of this alternative meaning, Moser points to his interview with Metro's internal affairs department regarding his Facebook comment.

In response, Metro and the individual defendants argue that "[t]o the extent Moser claims that a genuine issue of material fact [regarding the meaning of his Facebook comment] exists and precludes summary judgment, Moser failed to raise this argument below and, thus, has waived his ability to assert it for the first time on appeal." That contention is correct and should be dispositive of this appeal.

In his motion for summary judgment, Moser set forth the relevant facts, which included the finding in Metro's administrative Adjudication of Complaint that Moser's Facebook comment "would . . . tend to negatively impact the Department's ability to serve the public, would impede the performance of [Moser's] duties in SWAT, and thus, has made [him] ineffective in [his] current assignment." Importantly, Moser did not advance his alternative interpretation of his Facebook comment in his statement of undisputed facts filed with his summary judgment motion. And, when discussing the merits of his motion, he wrote the following:

> The Defendants actually misunderstood Moser's comment. The statement that it was "too bad" that the assailant did not have

> "holes in him" was a reference to the fact that the Officer who was shot did not get off any defensive shots in connection with his being ambushed. *However, for purposes of the First Amendment the Defendant's misunderstanding is irrelevant.*"

(Emphasis added and citation omitted.) Rather than argue that there was a disputed issue of material fact about the meaning of his Facebook comment, Moser argued that there was an "absence of actual disruption."

Similarly, in his opposition to the defendants' motion for summary judgment, Moser reiterated that "[t]he relevant undisputed material facts . . . are contained within Moser's Motion for Partial Summary Judgment," and that the different meanings attributed to his Facebook comment did not matter:

> As set forth by the citation to the record in Footnote 5 to Moser's Motion for Partial Summary Judgment (Doc. #38), the Defendants actually misunderstood Moser's statement. His comment regarding the suspect not having any "holes" was a statement regretting the fact that the ambushed officer did not get off any defensive shots. *However, the misunderstanding by the Defendants is irrelevant to the First Amendment analysis.*

(Emphasis added.)

Finally, in his motion for reconsideration by the district court, Moser did not raise the meaning of his Facebook comment as a disputed factual issue. Instead, Moser argued

that the district court overlooked a different factual dispute, concerning whether Facebook readers could discern that Moser was a police officer for Metro.

The majority acknowledges in a footnote that "Moser did state to the district court that the comment's meaning was irrelevant as a legal matter," but nonetheless holds that "the issue of the comment's meaning is not waived" because Moser "provided evidence from the record that supported his interpretation of the comment." Opinion at 16 n.5. But this reasoning fails to recognize the importance of Moser's concession and allows him to have it both ways—to both tell the district court that a dispute is *legally irrelevant*, so that Metro had no reason to put forth evidence concerning the statement's meaning, but to also preserve the issue for appeal in case the district court ruled against him.

*Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026 (9th Cir. 2001), demonstrates why reversing the district court's grant of summary judgement on the basis that multiple meanings could be attributed to the Facebook comment is inappropriate. In *Carmen*, the plaintiff-appellant argued on appeal that the district court's grant of summary judgment should be reversed because evidence not referenced in the summary judgment papers in the district court revealed a genuine issue of material fact. The panel held that, in such a situation, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found." *Id*. at 1031. The panel gave two reasons for its decision: First, to hold otherwise would place an unmanageable burden on the district court. *See id.* Second, to hold otherwise would be "profoundly unfair to the movant," who

would be "denied a fair opportunity to address the matter in the reply papers." *Id*.

In this case, Moser not only failed to identify the meaning of his Facebook comment as a disputed issue of material fact but told the district court up front that, despite the parties' different interpretations of his comment, that issue was legally irrelevant. As a result, the district court had no reason to determine whether the meaning of the Facebook comment presented a genuine dispute of fact material to the *Pickering* balancing test. And the defendants-appellees had no reason either to submit evidence as to how the Facebook comment was most likely to be understood, including its context and objective meaning, or to argue that Moser's professed intended meaning in making the comment was irrelevant.

The majority overlooks these consequences of Moser's waiver when it explains that "because Moser's statement is ambiguous . . . the government had to provide some evidence to support its prediction." Opinion at 21 n.8. As I shall explain shortly, the notion that the statement was ambiguous is far-fetched, and, more importantly, under our precedent, the relevant question is not whether the statement is conceivably ambiguous but whether Metro reasonably determined how it would be understood by others. In any event, in this circumstance, where no exceptional circumstances explain why the issue was not raised to the district court, "appellants may not upset an adverse summary judgment by raising an issue of fact on appeal that was not plainly disclosed as a genuine issue before the trial court." *Int'l Union of Bricklayers & Allied Craftsman Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

**II**

Moser was quite correct, for two intertwined reasons, when he twice informed the district court that the parties' disagreement over the meaning of his Facebook comment was irrelevant to the outcome of the *Pickering* balancing test.

First, under settled precedent, the police department could rely when deciding whether to retain Moser in his SWAT position on what it understood Moser to have meant or what he would be understood by others to have meant, provided that such interpretations were reasonable. In conducting the *Pickering* balancing test, "courts must give government employers 'wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.'" *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 979 (9th Cir. 1998) (alteration in original) (quoting *Connick v. Myers*, 461 U.S. 138, 151 (1983)).

Consistently with these precepts, courts conducting *Pickering* balancing are to "give[] substantial weight to government employers' *reasonable* predictions of disruption, even when the speech involved is on a matter of public concern." *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (emphasis added). *Waters* explained this reasonableness standard by contrasting *Connick v. Myers*, 461 U.S. 138 (1983), which held that "[t]he limited First Amendment interest involved here does not require that [the public employer] tolerate action which he *reasonably* believed would disrupt the office, undermine his authority, and destroy close working relationships," *id*. at 154 (emphasis added), with *Texas v. Johnson*, 491 U.S. 397 (1989), which held that "[n]o *reasonable* onlooker would

have regarded [the individual's] generalized expression of dissatisfaction with the policies of the Federal Government as a direct personal insult or an invitation to exchange fisticuffs," *id.* at 409 (emphasis added). As these examples demonstrate, the pertinent consideration determining the strength of an employer's interest for purposes of *Pickering* balancing is what message the government reasonably concluded was conveyed.

The majority holds Moser's statement objectively ambiguous, but does not—and could not—declare Metro's much more sensible interpretation unreasonable. Instead, the majority simply cites Moser's asserted *subjective* interpretation, as to what he *meant*, for this conclusion. As the majority explains, "[t]he parties . . . do not agree on the objective meaning of Moser's statement. Metro believes that Moser's comment advocated unlawful use of deadly force: Moser wished that the officers who captured the suspect would have shot him in retaliation for his earlier shooting of a police officer." Opinion at 13–14. "Moser . . . offered a different take on his statement." Opinion at 14. But Moser's asserted "take" is hardly grounds for finding objective ambiguity in what he actually said. The majority nonetheless indulges Moser's professed alternative meaning of his comment, explaining that Moser may have been "express[ing] frustration . . . at the perils of police officers being struck down in the line of duty;" that his comment, so interpreted, "touches on an important public policy issue that falls within his personal experience;" and that—for reasons that are not explained—it not only "highlights the perils faced by police officers," but also highlights "the government's failure to protect them." Opinion at 14–15.

An objectively reasonable understanding of the comments, their tone, and their context supports as more

than just reasonable the police department's and the district court's interpretation of the meaning Moser's statement actually conveyed, whatever he meant to say, and whether or not a modicum of ambiguity lurks in the statement (which I do not think it does). First, as the majority recognizes, Moser himself characterized his comments as "completely inappropriate;" expressing the wish that the ambushed officer had been able to defend himself would not be "completely inappropriate." Second, Moser's post-hoc explanation is entirely implausible. Moser's comment concerned the arrest of the suspect—"Thanks to a Former Action Guy (FAG) and his team we caught that asshole. . . It's a shame *he* didn't have any holes in *him*." (Ellipsis in original and emphasis added.) Moser's post-hoc explanation, in context, focuses on the earlier incident, in which the suspect shot a different officer from the one who captured him. Moser's comment was most reasonably understood as a vivid portrayal of a desire for revenge at the point of capture, not as a way of saying that he wished the injured officer had earlier been able to pull out a gun in self-defense. Finally, as the district court recognized, "because Moser posted his comment in response to a third party's Facebook post—as opposed to on a personal profile with privacy restrictions—he spoke in a public setting," where other people with Facebook accounts could view his comment. Thus, the majority is assuredly wrong that "the chance that the public would have seen the Facebook comment remained low," Opinion at 21, and so wrong in concluding that Moser's professed private, idiosyncratic meaning matters.

For each of these reasons, Moser's manufactured factual dispute about the meaning of his statement should not be the basis for reversing the district court.

Second, and relatedly, the police department could properly consider Moser's fitness for his job based on its reasonable interpretation of his statement, whether or not the statement would generate disruption in the workplace.

For the bulk of its opinion, the majority treats plausible workplace disruption, in the sense of inter-employee disruption or dysfunction, as the only employer interest relevant in the *Pickering* balance, and maintains that the summary judgment record is insufficient to support a prediction of disruption in that sense. But that disruption focus is entirely too narrow.

*Pickering* itself, the seminal case protecting government employees from discipline for their speech in some circumstances, made clear other management interests than workplace disruption implicated by the objectively reasonable meaning of an employee's communication are pertinent. In *Pickering*, one reason that the teacher's dismissal was improper was because his statements were "neither shown nor . . . presumed to have in any way . . . *impeded the . . . proper performance* of his daily duties in the classroom." *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois*, 391 U.S. 563, 572–73 (1968) (emphasis added). Similarly, *Rankin v. McPherson*, 483 U.S. 378 (1987), explained that in *Pickering* cases courts should look at, among other things, "whether the statement . . . *impedes the performance of the speaker's duties*." *Id.* at 388 (emphasis added). This court, drawing on *Pickering* and its progeny, has specifically recognized that it is "relevant to the *Pickering* determination that an employee's speech interferes with the fulfillment of his own office duties." *Brewster*, 149 F.3d at 981 (citing *Rankin*, 483 U.S. at 388)).

Here, Metro had a valid interest in continually evaluating Moser's qualifications as a sniper. Those qualifications

assuredly include good judgment as to when to use force and also good judgment as to both public perception and perception by fellow officers concerning one's calibration of when the use of force is justified. Viewing Moser's statement as reasonably understood to sanction the use of unnecessary force, Metro had good reason to conclude that harboring and communicating that view was a serious impediment to performance of the duties of a SWAT officer.

The majority resists this evaluation of Metro's interests as Moser's employer, insisting that "Moser's Facebook comment is like that of [Ardith McPherson,] the plaintiff in *Rankin*," Opinion at 21, and so may not give rise to employer interests beyond those held inadequate in *Rankin*. But to the degree the statements triggering the employees' discharge or transfer in the two cases are similar, the relevant employer concerns are to a much greater degree distinct. Moser's SWAT force position is not at all like the clerical job held by the plaintiff in *Rankin*, and his statement directly concerned the type of activity he carried out as a SWAT officer.

In *Rankin*, Ardith McPherson worked for the constable in a "purely clerical" position. 483 U.S. at 392. She was not a commissioned peace officer, and she served "no confidential, policymaking, or public contact role." *Id*. at 391–92. Nor was McPherson's discharge "based on any assessment . . . that her remark demonstrated a character trait that made respondent unfit to perform her work." *Id*. at 389. *Rankin* repeatedly emphasized this point, instructing that in the *Pickering* balance "[t]he burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails," *id.* at 390, and concluding that "[g]iven the function of the agency, McPherson's position in the office, and the nature of her statement, we are not persuaded that

Rankin's interest in discharging her outweighed her rights under the First Amendment," *id.* at 392.

In this case, the district court on summary judgment noted as an undisputed fact that "Moser's comment led his superiors to question his judgment and therefore fitness to serve as a SWAT sniper," citing the Department's Labor Board decision and the deposition of the Director of Labor Relations. *Sabatini*, 369 F. Supp. at 1093. When conveying the meaning of Moser's Facebook comment, the district court allowed that "[e]ven if Moser wasn't sincere, this cavalier and callous comment conveyed a lack of awareness for the degree of trust placed in SWAT officers," citing the same evidence. *Id.* at 1092–93. The Labor Board decision found that Moser's comment demonstrated a "serious lack of judgment" and that "they expect more of the critical positions in the Department, such as SWAT." And the deposition of the Director of Labor Relations discussed the Adjudication of Complaint, which similarly stated that Moser's comment "would . . . tend to negatively impact the department's ability to serve the public, would impede the performance of [his] studies in SWAT, and thus, ha[d] made [him] ineffective in [his] current assignment." When asked the basis for the Adjudication of Complaint, the Director of Labor Relations explained that "it appears from this comment that he's become a little callus [sic] to killing someone. And someone who's in SWAT who particularly has to shoot a lot, we want them taking that position very seriously . . . . And writing a comment like this shows that you might not take this as seriously anymore."

All of these evaluations concern Moser's qualifications for his particular position in light of a reasonable understanding of the comments that led to his removal as a SWAT officer.

# III

In sum, although the majority holds that the district court erred in granting summary judgment for Metro because of factual disputes related to the meaning of Moser's Facebook statement, Moser professed before the district court, correctly, that any such dispute was not relevant to the First Amendment issues in this case. As Moser waived that asserted dispute, he cannot rely on it on appeal. Further, Metro's interpretation of Moser's statement is not only reasonable, but considerably more so than what Moser says he meant. Metro could properly consider whether Moser was fit for his job duties as a sniper in light of its reasonable interpretation.

Stepping back, what the majority holds is that a police department may have to retain on its SWAT squad an officer who appears to support the unnecessary use of force in the capture of a suspect in a police shooting. I do not for a minute doubt that protecting the First Amendment right of public employees to contribute to the public dialogue on issues of public importance is of critical importance to our ongoing experiment in self-government. But we are living in a time when, driven by public concern, police departments nationwide are engaged in self-examination concerning how best to curb the use of excessive force by police officers as they carry out law enforcement's critical role. Tying the hands of those departments in making personnel decisions based on reasonable evaluations of those officers' ability to make measured judgments about the use of force— especially where, as here, the decision concerns an elite officer entrusted with high-caliber weapons and particularly dangerous assignments—can only stand in the way of these efforts.

I would therefore affirm the district court's grant of summary judgment, and so dissent.